456 F.2d 532
 1972 Trade Cases P 73,846
 PFIZER INC., et al., Defendants-Petitioners,
v.
Honorable Miles W. LORD, United States District Judge,
Respondent, and State of Kansas and Named
Plaintiffs in Forty-Eight Other Cases,
Plaintiffs-Respondents.
 No. 71-1580.
 United States Court of Appeals,
Eighth Circuit.
 Feb. 15, 1972.
 
 Richard W. McLaren, Asst. Atty. Gen., and Gregory B. Hovendon, Paul A. Owens, Harry First, Attys., Dept. of Justice, Washington, D. C., for the United States.
 John A. Cochrane, St. Paul, Minn., Thomas J. Greenan, Seattle, Wash., Roger A. Johnson, Charles Quaintance, Jr., and Floyd E. Boline, Minneapolis, Minn., for respondents.
 
 
 1
 Robert Morgan, Atty. Gen., Jean A. Benoy, Deputy Atty. Gen., and Louis W. Payne, Jr., Associate Atty., State of N. C., Raleigh, N. C., for respondent, North Carolina.
 
 
 2
 Gibson, Dunn & Crutcher, Los Angeles, Cal., Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., for Pfizer, Inc.
 
 
 3
 Winthrop, Stimson, Putnam & Roberts, New York City, for Bristol-Myers Co.
 
 
 4
 Faegre & Benson, Minneapolis, Minn., for Bristol-Myers Co., Squibb Corporation and The Upjohn Co.
 
 
 5
 Donovan, Leisure, Newton & Irvine, New York City, Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for American Cyanamid Co.
 
 
 6
 Cravath, Swaine & Moore, New York City, for Squibb Corporation.
 
 
 7
 Covington & Burling, Washington, D. C., for The Upjohn Co.
 
 
 8
 Before MATTHES, Chief Judge, and BRIGHT and ROSS, Circuit Judges.
 
 
 9
 PER CURIAM.
 
 
 10
 Petitioners, Pfizer Inc., American Cyanamid Company, Bristol-Myers Company, Squibb Corporation, and The Upjohn Company, manufacturers of drugs, bring this action, seeking a writ of mandamus pursuant to the All Writs Statute, 28 U.S.C. Sec. 1651, and F.R.A.P. Rule 21 directing the Hon. Miles W. Lord, District Judge for the District of Minnesota, to recuse himself from presiding over the above entitled cases. Before instituting this action, petitioners, on September 20, 1971, filed moving papers and affidavits pursuant to 28 U.S.C. Sec. 144, asking Judge Lord to disqualify himself for reasons of bias and prejudice. Judge Lord orally denied the motion for "legal insufficiency." Although Judge Lord has declined to respond to petitioners' allegations, respondents, who are plaintiffs in the pending actions, have filed answers objecting to the issuance of the writ. In a separate motion, respondents seek damages and costs allegedly suffered by reason of delay to the proceedings attributable to the filing of petitioners' action.
 
 
 11
 We have carefully examined the petition, the underlying joint affidavit, the responses thereto, and portions of the record pertinent to petitioners' claims. We reach the merits of the petition and deny petitioners the relief requested. We also deny respondents' motion for damages. We do, however, deem it appropriate to comment on certain aspects of this case.
 
 
 12
 In a separate action filed contemporaneously, petitioners seek a writ of mandamus as a means of obtaining relief from a discovery order issued by Judge Lord which requires disclosure of certain documents and papers which petitioners claim to be covered by the attorney-client privilege. Our opinion in that controversy, No. 71-1581, 456 F.2d 545, and our opinion in this case are filed together.
 
 I.
 BACKGROUND OF THE PRESENT LITIGATION
 
 13
 The present lawsuits involve forty-nine civil antitrust damage actions which have been brought by a number of different categories of plaintiffs, including the United States, states, wholesalers and retailers, insurance companies, private hospitals, agricultural purchasers, and competitors. These actions, and approximately one hundred others, most of which now have been settled, grew out of Federal Trade Commission proceedings instituted in 1958[1] and a criminal antitrust action brought by the United States in 1961.[2]
 
 
 14
 In substance, the various complaining parties charge that petitioners, individually and in concert, committed fraud on the United States Patent Office in connection with the prosecution of the Conover patent owned by Pfizer on tetracycline, a broad spectrum antibiotic, and, in addition, that they thereafter conspired to exclude competition and fix antibiotic drug prices in violation of the Sherman Act. The pricing policies of these drug companies were the subject of Federal Trade Commission investigations between 1951 and 1958 and an extensive investigation by a Senate subcommittee, which subsequently reported its findings to the full committee.[3]
 
 
 15
 Following the Commission proceedings, several civil antitrust actions were brought against some or all of the petitioners. After the jury verdict in the criminal case, more than one hundred similar actions were commenced. A large number of these cases were venued in the Southern District of New York, some having been commenced in that district and others having been transferred to that district for coordinated pretrial proceedings before the Hon. Inzer B. Wyatt. A majority of these cases were settled with the approval of Judge Wyatt. His opinion approving the settlement is reported as State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir. 1971).
 
 
 16
 Following the settlement of the bulk of the cases, the Judicial Panel on Multidistrict Litigation assigned the nonsettling cases to Judge Miles Lord, who had been specially assigned to the Southern District of New York.[4] Subsequently, over defendants' objection, Judge Lord transferred the majority of those cases to the District of Minnesota for trial, pursuant to 28 U.S.C. Sec. 1404 (a). This action was approved by the Second Circuit in Pfizer, Inc. v. Lord, 447 F.2d 122 (2d Cir. 1971).
 
 
 17
 Judge Wyatt's opinion outlines the historical background of the prior civil, criminal, and administrative proceedings. We relate some of this history here as background. Cyanamid, in late 1948, produced one of the first broad spectrum antibiotics, chlortetracycline, which it subsequently marketed under the trade name Aureomycin. Cyanamid received a patent (Duggar) on chlortetracycline in 1949 and an improvement patent (Niedercorn) in 1950.
 
 
 18
 In late 1952, Pfizer claimed discovery of tetracycline, an antibiotic said to be highly superior in some respects to other antibiotics then on the market, through dechlorination of chlortetracycline. Pfizer applied for a patent on tetracycline in late 1952; Cyanamid applied for a patent on tetracycline in early 1953. Because of the conflicting applications, the Patent Office declared an "interference." In two meetings held in November 1953, Pfizer and Cyanamid entered into an agreement by which Cyanamid would license Pfizer under the Duggar and Niedercorn patents. In addition, it was agreed that proofs of priority on tetracycline would be exchanged and that the party found not to have priority would concede priority to the other. The party receiving the patent on tetracycline would then license the other. Thereafter, on the exchange of evidence as to priority, Cyanamid conceded in February of 1954 that Pfizer's patent (Conover) represented the first discovery of tetracycline. The patent was issued to Pfizer in January 1955.
 
 
 19
 Commencing in 1954, Bristol began producing tetracycline and selling it in bulk to Squibb and Upjohn. Bristol, Squibb, and Upjohn sued Pfizer for a declaratory judgment invalidating the patent. The parties reached a settlement whereby licenses under the patent were granted by Pfizer to Bristol, Squibb, and Upjohn.
 
 
 20
 In 1958 the Federal Trade Commission, after extensive investigation, issued a complaint against the five drug companies, alleging that Pfizer had secured its patent on tetracycline by conspiracy and fraud, and that all of the drug companies were guilty of withholding material information from the Patent Office and were guilty of monopolistic practices in the production and sale of broad spectrum antibiotic drugs. This aspect of the litigation ended in 1969 without a conclusive finding of guilt, except as to misconduct of Pfizer and Cyanamid before the Patent Office. See discussion in State of West Virginia v. Chas. Pfizer & Co., supra, 314 F.Supp. at 715-718.
 
 
 21
 After reviewing the prior proceedings, Judge Wyatt observed:
 
 
 22
 After two exhaustive and lengthy investigations by two agencies of the government, there are no findings of any misconduct by any of the defendants which would show, even prima facie, a violation of the antitrust laws. The only findings of misconduct are those by the Commission that Pfizer and Cyanamid each in substance committed a fraud on the Patent Office; the Commission, however, found that no conspiracy in this respect between Pfizer and Cyanamid had been proved. As to the separate misconduct of Pfizer and Cyanamid before the Patent Office, our Court of Appeals has said that this is relevant to the issue of violation of the antitrust laws "only insofar as the acts of Pfizer and Cyanamid supported an inference that at the November 1953 meetings they had entered into agreements to fix prices or to exclude others".
 
 
 23
 * * *
 
 
 24
 Thus, in the Commission proceedings there are no findings of any misconduct by three of the defendants-Bristol, Squibb and Upjohn. As to the other two defendants, Pfizer and Cyanamid, the only finding of misconduct has to do with patent prosecutions in the Patent Office. Aside from serious questions of law about the effect of this misconduct, it would not itself constitute any violation of the antitrust laws; at best, it might arguably be some evidence of an attempt to monopolize. [314 F.Supp. at 741-742]
 
 
 25
 Judge Wyatt noted that the reversal of the criminal antitrust convictions against Cyanamid, Pfizer, and Bristol "leaves the criminal proceeding without substantial effect at this point." Id. at 742.[5]
 
 
 26
 The pending actions reiterate the charges made in the prior administrative and judicial proceedings that the defendants conspired to restrain interstate commerce in the manufacture, sale, and distribution of tetracycline and other broad spectrum antibiotic products and also conspired to monopolize the manufacture, sale, and distribution of those products.
 
 II.
 THE PRESENT PETITION
 
 27
 In the instant proceedings, petitioners assert that Judge Lord, through his actions, statements, and conduct, has demonstrated personal bias and prejudice by the following:
 
 
 28
 (1) taking aggressive action to attempt to dissuade the United States Department of Justice from settling its civil action against the defendants in an effort to assist the other plaintiffs;
 
 
 29
 (2) suggesting that the United States Government, if it were to settle its civil action, would be permitting the defendants to "buy a monopoly";
 
 
 30
 (3) declaring that: "We may have another proceeding, or, at least some moves" against defendants to vindicate the integrity of the United States Patent Office and courts for fraud on those tribunals;
 
 
 31
 (4) urging the Department of Justice to investigate the Patent Office, which he characterized as "the sickest institution that our Government has ever invented" and "the weakest link in the competitive system in America";
 
 
 32
 (5) refusing, without a hearing, to consider a settlement of the treble damage class actions at a dollar amount previously approved in these cases by another district court and the Court of Appeals for the Second Circuit, which caused one damage plaintiff to withdraw its agreement to settle for that dollar amount;
 
 
 33
 (6) soliciting law suits against defendants by urging a private attorney to find some hospital patients to form a new class of plaintiffs;
 
 
 34
 (7) interrogating a deposition witness in an aggressive and angry manner, in an attempt to intimidate the witness and to influence his testimony along lines desired by plaintiffs, suggesting openly that the witness was evasive and lying, and threatening to levy a fine; and
 
 
 35
 (8) accusing counsel for one of the petitioners of instructing his client to "manufacture" or "doctor" evidence.
 
 III.
 MANDAMUS AS A REMEDY IN RECUSAL CASES
 
 36
 We turn our consideration to a determination whether mandamus may be utilized by the petitioners at this stage of the proceedings to review Judge Lord's determination not to disqualify himself. Although the authorities are not uniform, a substantial body of law supports the proposition that mandamus to a United States Court of Appeals will lie when a district judge has rejected affidavits seeking his recusal as "legally insufficient." Compare (mandamus appropriate): Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); Pfizer, Inc. v. Lord, 449 F.2d 119 (2d Cir. 1971); Wolfson v. Palmieri, 396 F.2d 121 (2d Cir. 1968); Rosen v. Sugarman, 357 F.2d 794 (2d Cir. 1966); In re Union Leader Corp., 292 F.2d 381 (1st Cir.), cert. denied, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961); United States v. Ritter, 273 F.2d 30 (10th Cir. 1959); Minnesota & Ontario Paper Co. v. Molyneaux, 70 F.2d 545 (8th Cir. 1934); with (mandamus inappropriate): Albert v. United States District Court, 283 F.2d 61 (6th Cir. 1960), cert. denied, 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 706 (1961); Green v. Murphy, 259 F.2d 591 (3d Cir. 1958); Korer v. Hoffman, 212 F.2d 211 (7th Cir. 1954). Judge Aldrich in In re Union Leader Corp., supra, noted:
 
 
 37
 From the general standpoint of "the interest of justice," the right to be tried before an unbiased judge is also basic in our judicial system. Although there are differences of opinion, we agree . . . that public confidence in the courts may require that such a question be disposed of at the earliest opportunity . . .. This need not commit us to entertaining every rejected affidavit of prejudice; nor need we presently set forth the limits. It is to be borne in mind that mandamus is a discretionary writ. [292 F.2d at 384]
 
 
 38
 We think it noteworthy that the United States, as a respondent in these proceedings, suggests that mandamus is an appropriate remedy "given the complexity, number and probable duration of the cases involved"[6] and that "rather than leave such a serious charge unresolved throughout this lengthy litigation . . . the writ may properly be used here to review Judge Lord's denial of petitioner[s'] motion."
 
 
 39
 Accordingly, we believe that mandamus is an appropriate vehicle to review Judge Lord's refusal to recuse himself.
 
 IV.
 THE STANDARD FOR RECUSAL
 
 40
 Before turning to detailed examination of the claims made by the petitioners, we review the legal principles which govern the determination of this case. The applicable substantive law is contained in 28 U.S.C. Sec. 144, which reads:
 
 
 41
 Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 
 
 42
 The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.
 
 
 43
 The Supreme Court, in Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), construed a predecessor statute to mean that, although the challenged judge may not pass upon the truth of the facts alleged in the affidavit, he may decide whether the affidavit meets the procedural requirements of the statute and whether the facts alleged give fair support to the charge of bias and prejudice. By retaining the basic provisions of this earlier statute in the present Sec. 144, Congress apparently acquiesced in the procedure whereby a challenged judge may initially pass upon the legal sufficiency of the affidavit. See, Note, Disqualification of Judges, 79 Harv.L.Rev. 1435, 1438-1439 (1966); Schwartz, Disqualification for Bias in the Federal District Courts, 11 U.Pitt.L.Rev. 415, 423 (1950). Petitioners have raised no question concerning the procedure followed by Judge Lord in passing upon the legal sufficiency of the affidavit.
 
 
 44
 The statutory concept of "personal bias or prejudice" was explained by the Supreme Court in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966):
 
 
 45
 The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. [384 U.S. at 583, 86 S.Ct. at 1710]
 
 
 46
 In deciding whether petitioners' affidavits demonstrate this personal bias or prejudice, we accept the truth of the facts recited therein. We determine the validity of petitioners' conclusion of bias by examining the cited facts against the record presented to us.
 
 V.
 EARLY INCIDENTS
 
 47
 The claim of bias and prejudice against Judge Lord appears to rest primarily on incidents which occurred in late August and early September 1971, although petitioners refer to Judge Lord's conduct and statements on earlier occasions as reflecting personal bias and prejudice. These early incidents provide a background against which the later remarks and comments of Judge Lord can be evaluated. We examine Judge Lord's comments chronologically but focus on the later comments.
 
 The joint affidavit, in part, states:
 
 48
 We have set forth in this joint affidavit specific incidents which we believe manifest Judge Lord's bias and prejudice. In substance these incidents show that Judge Lord has improperly assumed the role of prosecutor and advocate against defendants and has increasingly become more aggressive and open in this role. . . . Each affiant submits his affidavit with extreme personal reluctance. We do not assert that Judge Lord's prejudice is necessary and deliberate or a conscious one. . . .
 
 
 49
 While from the beginning there were indications and hints of Judge Lord's personal prejudice against and hostility toward defendants, none of these defendants believed that it was proper to take the serious step of making an application to recuse on these incidents alone. Defendants hoped that Judge Lord's appearance of bias and his proscutorial attitude were illusory . . ..
 
 
 50
 The extent of Judge Lord's prejudice and bias recently became clear as plaintiffs began taking depositions . . . of Harvey W. Edelblute, a patent attorney formerly employed by American Cyanamid Company, who, during the 1948-55 period, prosecuted Cyanamid's aeuromycin and tetracycline patent applications and was a participant in events leading to the patent aspects of this litigation . . ..
 
 
 51
 (a)
 
 
 52
 At the request of the respondents, Judge Lord attended the first six days of Mr. Edelblute's deposition. Although there is some evidence that petitioners would have preferred that Judge Lord not be present, we feel that his presence is not critical.[7]
 
 
 53
 Petitioners claim that Judge Lord manifested a biased state of mind while attending this deposition. We have reviewed this contention against a transcript of over one thousand pages in length and tape recordings of a portion of the deposition. We conclude from reading the transcript and listening to the tapes that much of the difficulty was caused by the compound questions asked by the attorney for the United States who interrogated Edelblute. Additionally, we note that Edelblute did not always respond directly to the questions asked, even when they were asked in a clear-cut manner.
 
 
 54
 The petitioners' affidavit cites several comments made during the deposition as proof of Judge Lord's bias:
 
 
 55
 THE COURT: I will tell you one thing: At some point this witness is going to get pinned down and answer direct questions. He is a lawyer. He is a witness. He is under oath. My observation here, which I don't propose to incorporate into anything that goes before the jury, [is] that he is acting in a very devious manner.
 
 Later the judge threatened the witness:
 
 56
 THE COURT: Now, that's not an answer to the question, and you are going to have to straighten out and fly right or the Court is going to impose a little fine on you.
 
 
 57
 MR. S. MURPHY [Counsel for Cyanamid]: Well, Your Honor, I am going to except to that.
 
 
 58
 THE COURT: You may except to it, and you may appeal from it. If he doesn't start answering questions, he is going to start getting fines for it.
 
 
 59
 We note that a later statement reflects an apparent change in Judge Lord's attitude toward the witness:
 
 
 60
 THE COURT: You don't have to worry about the case if the man is answering questions directly. He has done very much better since we had our chat.
 
 
 61
 Although we consider some of the cited comments to be inappropriate, perhaps even unfair to the witness, we cannot say that they demonstrate any particular personal prejudice against petitioners.
 
 
 62
 Petitioners additionally allege that Judge Lord questioned Edelblute in an "inquisitorial" manner. The comments below demonstrate that the witness, who was a trained lawyer, found no objection to Judge Lord's occasional questions.
 
 
 63
 THE COURT: All right. Now, I am sorry to interrupt, but sometimes a person will respond a little more directly to the Judge than to a lawyer and I am rather pleased with his answers at this point. Go ahead.
 
 
 64
 THE WITNESS: If I may say so, sir, your questions are a hell of a lot clearer than those being asked by Mr. Owens [Counsel for respondent United States].
 
 
 65
 This court has approved of a presiding judge questioning a witness in order to clarify facts and issues:
 
 
 66
 The trial judge in a federal court is not a mere presiding officer. It is his function to conduct the trial in an orderly way with a view to eliciting the truth, and to attaining justice between the parties. It is his duty to see that the issues are not obscured, that the trial is conducted in a proper manner, and that the testimony is not misunderstood by the jury, to check counsel in any effort to obtain an undue advantage or to distort the evidence, and to curtail an unnecessarily long and tedious or iterative examination or cross-examination of witnesses. He has the authority to interrogate witnesses, and to express his opinion upon the weight of the evidence and the credibility of the witnesses. Fidelity & Deposit Co. of Maryland v. Bates, 76 F.2d 160, 170 (8th Cir. 1935).
 
 
 67
 We see no reason why such power need be restricted to the actual trial. We think that a trial judge may comment and inquire during the course of pretrial proceedings so long as he does so in a nonprejudicial manner.
 
 
 68
 After reviewing the transcript and tapes of the Edelblute deposition, we are not impressed with the petitioners' claims that Judge Lord demonstrated personal bias and prejudice through his comments at the deposition, or by his interrogation, of Edelblute. To the extent Judge Lord's remarks can be construed to impugn Edelblute's veracity, they would seem to be prematurely made during pretrial proceedings and therefore unfair, but the remarks fail to reflect any personal bias or prejudice. This type of prejudgment, although unfortunate, cannot serve as a basis for recusing Judge Lord.
 
 
 69
 (b)
 
 
 70
 Petitioners also charge that Judge Lord arbitrarily rejected a proposal from the State of Hawaii that it settle its action under the so-called "Alabama plan," a formula which had been judicially approved by Judge Wyatt.[8] Petitioners assert that the State of Hawaii withdrew a settlement proposal made to petitioners after Judge Lord informed their attorney by telephone that the court would refuse to approve this settlement or any settlement at the "Alabama plan" level. In a letter to all parties dated May 14, 1971, Judge Lord confirmed this telephone conversation and related that it would be "awkward" for him to approve the settlement on the basis of the meager information then known to him. The letter also stated that the adoption of Judge Wyatt's settlement plan would involve "an evaluation of plaintiffs' prospects" which the court was not prepared to make at that time.
 
 
 71
 Petitioners construe Judge Lord's comments as an unwarranted brushoff of a settlement proposal, reflecting bias. We note, however, that Judge Lord stated in the letter that his rejection of the proposed settlement would be "without prejudice to renewing the request at a later time." In the light of the meager information available on this issue, petitioners cannot prevail. We view with deep concern, however, any conduct or comments by the trial court which may hamper a fair settlement of any of the suits. We discuss the matter more fully in part VI of this opinion.
 
 
 72
 (c)
 
 
 73
 Petitioners also charge Judge Lord with soliciting lawsuits against them. The joint affidavit relates:
 
 
 74
 At the pretrial conference of March 6th, while recognizing that it "isn't the kind of a thing to spread on the record" he [Judge Lord] "urged," "invited" and "drafted" a private attorney to go out and find some hospital patients to form a class which none of the litigating plaintiffs had yet sought to represent.
 
 
 75
 Respondents dispute the accuracy of petitioners' recollection of Judge Lord's statements. Furthermore, respondents point out that Judge Lord was concerned with the adequate representation of hospital patients as a consumer class. After consideration of all aspects of the claims of hospital patients, Judge Lord directed that they be dismissed. We have considered this comment and other similar comments referred to in petitioners' affidavit. In the light of the record, we reject the contention that such remarks, individually or collectively, manifest personal bias against petitioners.
 
 VI.
 THE PROCEEDINGS OF SEPTEMBER 8, 1971
 
 76
 With this background, we now proceed to a consideration of a conference between court and counsel on September 8, 1971, which Judge Lord called in order to consider the "court's role" relating to the "public interest aspects" of a proposed settlement between petitioners and the United States. We deem Judge Lord's comments at this conference critical to our evaluation of the sufficiency of petitioners' charges.
 
 
 77
 Petitioners' affidavit asserts that during this conference Judge Lord displayed bias and prejudice (1) in aggressively attempting to dissuade the United States Department of Justice from consummating any settlement, thereby indicating an intent to assist the plaintiffs in the prosecution of their lawsuits; (2) in improperly implying that Edelblute had given false testimony at the discovery deposition; (3) in issuing, sua sponte, an order to show cause why certain competitor cases not then venued in Minnesota should not be transferred to that district for trial; and (4) in expressing great distrust for the United States Patent Office, thus demonstrating that he lacked the impartiality to determine fairly whether or not petitioners had committed fraud upon the Patent Office in obtaining the Pfizer patent on tetracycline.
 
 
 78
 In evaluating these charges, we have examined the transcript of this conference. Portions of the Edelblute deposition also bear upon these issues. During the course of that deposition, Judge Lord advised the parties that he had personally called Assistant Attorney General McClaren, in charge of antitrust matters for the Department of Justice, and had indicated special interest in the possible settlement of the government's action in Count I of its complaint which seeks cancellation of the Pfizer patent on tetracycline.[9]
 
 
 79
 In response to this request, Lewis Bernstein, Chief of the Special Litigation Section of the Antitrust Division, appeared before Judge Lord on September 8, 1971, and orally advised the court and interested counsel that the United States and the petitioners had reached a tentative agreement[10] to settle Counts II and III of the government's complaint, and that to consummate the settlement, the government contemplated dismissing Count I, which seeks cancellation of Pfizer's tetracycline patent for fraud. According to Mr. Bernstein, the proposed settlement provided that this patent would be dedicated to the public, rather than cancelled as fraudulently procured. Mr. Bernstein also stated that, since the other plaintiffs had relied upon the Department of Justice in developing the patent aspects of the litigation, the government would make available to plaintiffs all information it had gathered on that issue.
 
 
 80
 In response, Judge Lord expressed concern whether the public interest would be served by the dismissal of Count I and also expressed his displeasure at having his "game plan" upset by the settlement:
 
 
 81
 I don't believe in making speeches for the record that do not truly reflect my feelings on the subject. I deliberately combined the states cases with the Federal case on the theory that it might save us a multiplicity of trials. I was fully aware of the fact that Count 1 in equity was to be tried by the Court and we could try it with reasonable dispatch. For that very reason I sat in on Mr. Edelblute's, or a great portion of Mr. Edelblute's deposition testimony so that I could get some gauge of credibility, to kind of place the case and get the feel of it and see what it was that Mr. Owens was driving at.
 
 
 82
 All of these things have gone by the boards if you settle this case. You not only in effect give the plaintiffs an added burden of trying your case, but you upset the "game plan" which the Court, after a good deal of consideration and deliberation set as a means of disposing not only of the cases with which I was combined, but all of these cases in one proceeding.
 
 Judge Lord added:
 
 83
 This, as you know, Mr. Bernstein, has got to be practically the biggest single assignment ever taken on by a judge anywhere in the history of jurisprudence of any kind. So, if I have been guilty of trying to figure out a way where I could get at the key issues and dispose of them, I plead guilty to that. It stings me just a little bit when the rug is pulled out from under me and I now face considerable more work to get rid of this mountainous litigation. I am just human enough so that I feel very badly about my friends who are defending this case when I have to lean this way and indicate to them that I would find a shorter way of resolving it that might not work to their advantage because I know they would want a jury to do it rather than have me do it. But I would do what the law provides in that regard.
 
 
 84
 Petitioners also take umbrage at Judge Lord's comments upon Edelblute's testimony at the September 8th proceedings. Judge Lord stated:
 
 
 85
 . . . However, I am not unmindful of the fact that fraud on the Patent Office is here alleged and that for about seven days Mr. Harvey Edelblute sat on the witness stand and with all of the power at his disposal as a consultant and employee of the defendant corporation Cyanamid, he alleged that nothing which he did or said constituted fraud despite the holding of the FTC and the grand jury.
 
 
 86
 Finally, during the exchange with Mr. Bernstein, Judge Lord turned his attention to a possible relationship between the United States Attorney General and the Patent Office, suggesting:
 
 
 87
 I think you ought to tell your Attorney General, if he wants to look at something, he ought to look at that Patent Office. That has got to be the sickest institution that our Government has ever invented. It is just, as far as I can see, an attritional war between the patent applicant and the patent examiners, who apparently get paid on the piece work for how many patents they could put out. And you can examine for months some poor fellows that are out doing business and finally arrive at a price structure, and you might get an antitrust suit. But if you want to look, go back and look in your Patent Office and see what is happening to the Patent Office. I say that for the record and for posterity. That has got to be the weakest link in the competitive system in America.
 
 
 88
 The record manifests Judge Lord's obvious perturbation over the contemplated settlement. His words were strong. Yet his ire seems directed not at petitioners but at the government, which, according to Judge Lord, might be selling out the public interest.
 
 
 89
 We think it clear that Judge Lord misconceived his role vis-a-vis the settlement. Petitioners assert that a district judge lacks the power to approve or disapprove any proposed settlement between the government and the defendants. See Confiscation Cases, 7 Wall. 454, 19 L.Ed. 196 (1868); Ex parte American Steel Barrel Co., 230 U.S. 35, 33 S.Ct. 1007, 57 L.Ed. 1379 (1913). We have been shown no authority to the contrary.
 
 
 90
 We note, however, that the court's remarks concerning the public interest in the settlement of Count I rested upon Judge Lord's assumption, frequently stated in the record, that the government prove the truth of its allegations. Moreover, Judge Lord's concern over the upsetting of his "game plan" in managing the litigation may have been better left unsaid, but that statement does not manifest any personal bias and prejudice toward petitioners.
 
 
 91
 We find Judge Lord's remarks suggesting that the Attorney General ought to look at the Patent Office, "the sickest institution . . . ever invented," to be totally injudicious. These words should not have been spoken, and we wholly disapprove of them. Nevertheless, even if we accept petitioners' arguments that these comments disclose a prejudicial attitude concerning the relationship between petitioners and the Patent Office, these observations may have come as a result of Judge Lord's exposure to the prior proceedings and the facts disclosed during the pretrial proceedings. Thus, although Judge Lord's comments were gratuitous and wholly extraneous to the question then before him, we cannot say that they reflect an "extrajudicial bias" as is required for recusal under Grinnell, supra.
 
 
 92
 Because Judge Lord's conduct and comments may have discouraged settlements between the parties, we add a word of admonition to the litigants and to the District Judge. This complex and difficult litigation places unusual burdens upon an already overburdened federal court system and upon the very busy District Court for the District of Minnesota. Respondents have described the task of Judge Wyatt, who preceded Judge Lord in the handling of these cases, as "awesome." The Second Circuit has referred to the "sizeable judicial resources" already consumed by this litigation. Pfizer Inc. v. Lord, supra, 449 F.2d at 121.
 
 
 93
 This court is well aware that Judge Lord has expended great energy over many months in the management of these cases and in his effort to complete pretrial discovery. Yet, after all of this, months of trial may still lie ahead and years may elapse before all the threads of this litigation are unraveled. The incidents giving rise to these lawsuits occurred almost twenty years ago. We think there is much to be said in the public interest for the parties arriving at an amicable settlement without interference by the court. We think those parties to this litigation who may seek fair settlement deserve the approbation of the courts.
 
 
 94
 In reviewing the explanation given by Mr. Bernstein relating to the proposed settlement between the United States and petitioners, we particularly note that the proposed settlement requires the dedication of the patent to the public, and that, notwithstanding any settlement, government attorneys will make available to the other plaintiffs pertinent data relative to the claim of patent fraud. While other plaintiffs may prefer that the government continue its participation in this lawsuit, they may not demand it. We think it appropriate to state our view that we believe fair settlement of any of the plaintiffs' claims, including the claims of the United States, will likely promote the overall public interest. Conversely, any action of Judge Lord which discourages fair settlements will contravene the public interest.
 
 
 95
 In holding Judge Lord's actions to this point concerning the proposed settlements to be nonprejudicial, we are mindful that Judge Lord needed adequate time to familiarize himself with the case before encouraging the parties actively to seek settlement. We trust that he possesses the requisite knowledge and information at this time to pass promptly upon settlement proposals that may be submitted to him for approval. The policy of the law encourages compromise to avoid the uncertainties of the outcome of litigation as well as the avoidance of wasteful litigation and expense incident thereto. In light of the record presented to us, we think it appropriate to direct Judge Lord not to impede any fair settlement of any of the cases presently before him. This direction applies both to the government's proposed settlement and to any settlement reached by petitioners and any of the other plaintiffs.
 
 
 96
 We think it advisable for the benefit of the District Court and counsel to repeat here Judge Wyatt's analysis of factors to be considered in evaluating any settlement, an analysis approved by the Second Circuit:
 
 
 97
 Whether to approve the compromise involves an exercise of discretion. The Court is responsible for the protection of the many class members whose interests are involved but who do not appear in the action. Approval should be given if the settlement offered is fair, reasonable, and adequate. These terms are general and cannot be measured scientifically.
 
 
 98
 The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success. The Supreme Court directs the judge to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and to "form an educated estimate of the complexity, expense, and likely duration of such litigation * * * and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise". The Supreme Court then emphasizes: "Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." The quotations are from Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). [440 F.2d at 1085 quoting 314 F.Supp. 740-741]
 
 VII.
 CONCLUSIONS
 
 99
 We have reviewed Judge Lord's comments and his actions and have evaluated them against circumstances disclosed in cases in which appellate courts have forced a judge to recuse himself or reversed a judgment because of demonstrated bias. In Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed.2d 481 (1921), the affidavit was held to be sufficient because of the openly espoused anti-German animus of the trial judge. Cf. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). In United States v. Hatahley, 257 F.2d 920 (10th Cir.), cert. denied, 358 U.S. 899, 79 S.Ct. 222, 3 L.Ed.2d 148 (1958), the trial judge was openly biased in favor of the plaintiff Indians and "[a] public appeal on behalf of the plaintiffs was made for funds and supplies to be cleared through the Judge's chambers." Id., 257 F.2d at 926. See also Peacock Records, Inc. v. Checker Records, Inc., 430 F.2d 85 (7th Cir. 1970); Knapp v. Kinsey, 232 F.2d 458 (6th Cir. 1956); Whitaker v. McLean, 73 App.D.C. 259, 118 F.2d 596 (1941). The facts contained in petitioners' affidavit fall short of showing the bias and prejudice needed to recuse.
 
 
 100
 We recognize that advocates construe statements of a trial judge in a somewhat partisan light and thus magnify the impact of any comment of the court, whether it be favorable or critical.[11] A trial judge, unless he carefully weighs his pretrial comments, may very well leave the impression that he has improperly prejudged the case, a situation which seems to have occurred here. It is important that the litigant not only actually receive justice, but that he believe that he has received justice. A judge, like Caesar's wife, should be above suspicion.
 
 
 101
 Finally, we must consider respondents' motion for damages. We initially observe that this is a close case. We are convinced of petitioners' sincerity and good faith in filing their affidavits even though we have ruled adversely to their contentions. Clearly, some of Judge Lord's remarks have unnecessarily shaken petitioners' confidence in his impartiality. Accordingly, we deny respondents' motion for damages and costs.
 
 
 102
 Although we deny the petition for recusal, we add a caveat. This record adversely reflects upon Judge Lord's conduct during the pretrial proceedings. Reluctantly, we have pointed out his shortcomings in this case. We demand of Judge Lord, as we do of every trial judge in this circuit, a high standard of judicial performance with particular emphasis upon conducting litigation with scrupulous fairness and impartiality. We commend to Judge Lord the Socratic definition of the four qualities required of every judge: to hear courteously; to answer wisely; to consider soberly; and to decide impartially.
 
 
 103
 These cases will continue under Judge Lord's aegis. We expect him to provide an impartial forum in compliance with his judicial obligation. If petitioners' fears that they will not be afforded a fair trial should prove justified, they are not left without an appropriate remedy. See, e. g., Rosen v. Sugarman, supra, 357 F.2d at 798; In re Union Leader Corp., supra, 292 F.2d at 389.
 
 
 104
 Petition denied. The parties shall bear their respective costs.
 
 
 
 [1]
 In the matter of American Cyanamid Company et al., Docket No. 7211 (complaint filed July 28, 1958), order vacated and remanded, 363 F.2d 757 (6th Cir. 1966), order after remand aff'd, sub nom., Chas. Pfizer & Co., Inc. v. Federal Trade Commission, 401 F.2d 574 (6th Cir. 1968), cert. denied, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969)
 
 
 [2]
 United States v. Chas. Pfizer & Co., Inc., 61 Cr. 772 (Indictment returned August 17, 1961), rev'd for new trial, 426 F.2d 32 (2d Cir.), prior en banc hearing order vacated, opinion of panel modified, and petition for rehearing denied, 437 F.2d 957 (1970), new trial determination aff'd by equally divided court, 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972)
 
 
 [3]
 S.Rep.No.488, 87th Cong., 1st Sess. 1961
 
 
 [4]
 On making the assignment, the Judicial Panel stated:
 We are certain that Judges Miles Lord will direct discovery in such a way that pretrial in all non-settling cases will proceed expeditiously and efficiently and without delay or duplication. In re Antibiotic Drugs, 320 F.Supp. 586, 590-591 (Jud.Pan.Mult.Lit.1970).
 
 
 [5]
 The Supreme Court's recent affirmance of the Second Circuit's reversal of the criminal conviction, United States v. Chas. Pfizer & Co., Inc., 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972), has preserved the aptness of Judge Wyatt's comment upon the lack of finality of the criminal proceeding
 
 
 [6]
 Judge Lord himself has characterized this case as "practically the biggest single assignment ever taken on by a judge anywhere in the history of jurisprudence of any kind."
 
 
 [7]
 28 U.S.C. Sec. 1407(b) specifically contemplates the appointment of judges to preside at depositions in multi-district litigations
 
 
 [8]
 The Alabama plan provided for allocation and apportionment among all plaintiffs of the sum offered by petitioners to settle all claims during the time Judge Wyatt supervised this consolidated litigation. The plan is explained at 314 F.Supp. 726-730
 
 
 [9]
 Judge Lord said:
 I believe I made a record of the fact that I previously had talked to Mr. McClaren on the phone and suggested to him that Count No. I was so fraught with public interest and that the very integrity of the court system seemed at stake assuming prima facie that the allegations are established and the courts of this nation have been imposed upon, and for that reason I wanted to confer with him before he made any settlement . . ..
 
 
 [10]
 The tentative agreement provided that Counts II and III would be settled for approximately fourteen million dollars
 
 
 [11]
 Petitioners' assertion that Judge Lord has unjustifiably attacked the integrity of defense counsel falls into this category. The remark attributed to Judge Lord that "it would not bother me to find that lawyers were part of the conspiracy" does not directly cast any aspersions upon defense counsels' integrity, but we recognize that this cryptic remark might be so interpreted