**UNITED STATES of America,
Plaintiff-Petitioner,**

v.

**Honorable Miles W. LORD, Respondent,**

**and**

**Pfizer, Inc., et al.,
Defendants-Respondents.**

**No. 76–1492.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 16, 1976.

Decided Aug. 2, 1976.

Rehearing and Rehearing En Banc
Denied Nov. 12, 1976.

Paul A. Owens, Atty., Dept. of Justice Antitrust Div., Minneapolis, Minn., for plaintiff-petitioner.

S. W. Murphy, New York City, for defendants-respondents.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

PER CURIAM.

The United States petitions[1] this Court for a writ prohibiting Judge Miles W. Lord[2] from (1) discharging the jury panel in the event he should grant a mistrial, or (2) discharging any individual juror in connection with any further hearing in relation to respondents' motions for mistrial prior to review by this Court of any order granting the motions.

We refuse to prohibit Judge Lord from discharging the jury panel or from discharging individual jurors, but do prohibit him from transferring the action to another District Court in the event he should declare a mistrial. We also direct that the action be tried and decided promptly.[3]

On July 15, 1969, the United States filed a three-count action against the respondents.[4] Count I is an equitable action to cancel the tetracycline patent of Pfizer on the ground that it had perpetrated a fraud

---

1. Petition was brought under All Writs Act, 28 U.S.C. § 1651 and Rule 21, Fed.R.App.P.

2. United States District Judge for the District of Minnesota.

3. This Court has considered matters arising out of this complex litigation on at least nine previous occasions: *Pfizer, Inc. v. International Rectifier Corporation*, 538 F.2d 180 (8th Cir. 1976); *Pfizer, Inc. v. The Government of India*, Civ. No. 76–1064 (8th Cir., May 19, 1976); *Pfizer, Inc. v. International Rectifier Corporation*, Civ. Nos. 75–1089 and 75–1187 (8th Cir., March 26, 1975); *Pfizer, Inc. v. Lord*, 522 F.2d 612 (8th Cir. 1975); *In Re Fish & Neave*, 519 F.2d 116 (8th Cir. 1975); *Pfizer, Inc. v. International Rectifier Corporation*, Civ. No. 74–1425 (8th Cir., July 26, 1974); *Bristol-Myers Company v. Lord*, Civ. Nos. 73–1284 and 73–1285 (8th Cir., filed May 31, 1973); *Pfizer, Inc. v. Lord*, 456 F.2d 532 (8th Cir.), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972); *Pfizer, Inc. v. Lord*, 456 F.2d 545 (8th Cir. 1972).

4. This action was originally filed in the District of Columbia. Subsequently, Counts II and III were transferred to the Southern District of New York and consolidated with a number of private antitrust cases filed there. Following a settlement agreement in most of the private cases, Judge Lord was designated by Chief Justice Burger to the Southern District of New York to hear the "non-settling" antibiotic

on the patent office in procuring the patent, Count II is a common law action of deceit against Pfizer, Cyanamid and Bristol to recover damages incurred by the United States on direct and federally financed purchases of broad spectrum antibiotics resulting from overcharges, and Count III is an action under § 4A of the Clayton Act against Pfizer, Bristol, Cyanamid, Squibb and Upjohn to recover damages sustained by the United States on purchases of broad spectrum antibiotics resulting from the unlawful restraint of trade and monopolization in violation of §§ 1 and 2 of the Sherman Act. The United States claimed damages in excess of $376 million.

On November 25, 1974, Judge Lord commenced trial of the consolidated cases.[5] During the trial, all actions, except the one brought by the United States, were dismissed following settlement agreements calling for payments by respondents to nongovernmental plaintiffs of approximately $50 million. The last of the settlement agreements was reached in November of 1975 and was formalized and signed in January of 1976.

For reasons not wholly apparent from the record, the trial was virtually discontinued when the last of the nongovernment cases was settled. Since December of 1975, only two days of trial have been held.

On April 6, 1976, the respondents moved for a mistrial of this action contending that:

(1) publicity regarding the trial and settlements of the nongovernmental cases prevented a fair trial; (2) certain evidence introduced by the trial plaintiffs was either "irrelevant or collateral to the government's cause of action, and the introduction of massive amounts of evidence on such issues by the other plaintiffs has irreparably prejudiced defendants;" and (3) augmentation of the jury hearing the government's case (a consumer case) by the addition of jurors from the jury hearing the competitors' cases, prejudiced respondents right to a proper jury trial.

On May 17, 1976, the District Court ordered the jurors to report for jury duty on May 25, 1976. The purpose of the recall was to permit the parties " * * * to examine the jury for the purpose of whatever light can be shed upon their ability to go forward as fair and impartial jurors in the light of what [settlements] publicity has transpired."

On May 19, 1976, the respondents filed a contingent motion to transfer this action to the Southern District of New York; the contingency being the granting of a motion for a new trial.

█ On May 24, 1976, Judge Lord met with counsel for all parties. At that conference, the United States urged him to continue the trial and suggested that the jury be instructed with respect to their

cases. These cases were divided into consumer cases, viz: *Mutual of Omaha Ins. Co. v. American Cyanamid Co.*, 4–71 Civ. 6; *Building Service Union Health & Welfare Trust Fund v. Chas. Pfizer & Co., Inc.*, 4–71 Civ. 13; *California Physicians' Service v. Chas. Pfizer & Co., Inc.*, 4–71 Civ. 415; *United States of America v. Pfizer, Inc., et al.*, 4–71 Civ. 403, and competitor cases, viz: *International Rectifier Corp. v. American Cyanamid Co.*, Civ. 4–74–372; and *Malcolm-Gregg Co., Inc. v. Chas. Pfizer and Co., Inc.*, Civ. 4–74–373. On May 14, 1971, pursuant to 28 U.S.C. § 1404(a), Judge Lord transferred the New York cases, including the government's case, to the District of Minnesota and consolidated them with cases filed in Minnesota. Subsequently, Count I of the Government's case was transferred directly to the District of Minnesota and consolidated with the other actions for trial.

This Court refused to require Judge Lord to recuse himself from conducting pretrial proceedings or trying the cases. *Pfizer, Inc. v. Lord*, 456 F.2d 532 (8th Cir.), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972).

5. He caused two twelve-man juries to be selected, one for the competitor cases and one for the consumer cases. *See* n.4, *supra*. The "game plan" was to try the cases together until completion of the evidence in the competitor cases and have the one jury dispose of that case. The "consumer" cases would then go forward with the second jury. The theory was that while the evidence in the competitor cases was common to the consumer cases, the reverse was not true. If the two juries heard the evidence together in the competitor cases, that evidence would not have to be rehashed in separate consumer cases. The plan was an innovative one.

duty to disregard any trial-related publicity, as well as their duty to disregard the settlements that had been made. He did not accept this suggestion. He indicated that he would require each juror to be called and interrogated in chambers individually. On May 25, 1976, the jurors were brought into the courtroom where they listened to a preliminary statement. Judge Lord then proceeded to interrogate the jurors individually.[6] As a result of the interrogation, the number on the combined jury was reduced to ten; five remaining from each of the two original juries.

While the hearing was in process, the government filed a telephonic petition with this Court stating that the District Court's discharge of jurors constituted a clear abuse of judicial discretion. It requested an immediate stay on the following grounds:

(1) The necessity of preserving the Circuit Court's appellate jurisdiction to review the propriety of the District Court's action in interrogating and erroneously

---

**6.** The government contends that the interrogation was conducted by the court in a manner designed to ensure that a sufficient number of jurors disqualified themselves to require a mistrial. The interrogation of jurors Herberg and Nesbitt is illustrative of the complained of questioning.

THE COURT: Now the question is, could you be a better juror as you go into your deliberations if you hadn't heard about this? By that I mean this, the defendants are going to call on you and are calling on you to decide they owe nothing.

JUROR HERBERG: Yes.

THE COURT: That they are, you know, that they deserve a verdict here. Yet you have on one occasion heard about a forty million dollar settlement and you have seen the other people disappearing. That is something that jurors aren't ordinarily exposed to, I suppose. You know that. And the question that I have is, would it be easier for you to have been fair and impartial if you hadn't heard about these things and to really give the defendants a fair shot at being completely exonerated if you hadn't heard already that they paid forty million dollars in several other settlements?

JUROR HERBERG: I just now, as you told me that is a part of the case, I wasn't even, up till now, even sure this is part of this particular case. But, yeah, I don't think—I don't have any problems on that, I guess.

THE COURT: Any problems on what?

JUROR HERBERG: On seeing them as a potential non-payer at all. In other words, I haven't made up my mind yet on any portion of the case.

THE COURT: The settlements wouldn't interfere with your judgments?

JUROR HERBERG: Not right now.

    *   *   *   *   *   *

MR. MURPHY [Attorney for respondents]: Do you think there would have been a payment of money by one side to the other?

JUROR HERBERG: I don't know that there has been, really.

MR. MURPHY: No, I am not asking what you know. But do you think that when those settlements were made there would have been a payment by one side to the other?

JUROR HERBERG: I would assume that.

The court, out of Juror Herberg's presence, stated:

I think—this is a very bright juror—he has made up his mind. I don't think that by any interrogation he is going to change his mind. I think further examination would be superfluous. He is not going to disqualify himself. And he understands the implications of the questions you are asking him as well as you do, and he is just not going to disqualify himself, and that's all there is to it. He is getting paid an extra $25 a day on top of his state wage, and there is no way he is leaving this case.

The court then proceeded to question another juror with regard to whether she was just interested in serving on the jury out of her own economic interest.

THE COURT: * * * Now, at Honeywell do you get paid extra for serving on a jury?

JUROR NESBITT: As of February 1st I will get paid extra, I will. Before that Honeywell paid the difference between the twenty-five dollars here and my day's wage.

THE COURT: As of now you will be getting paid an extra twenty-five dollars a day over your regular salary?

    *   *   *   *   *   *

JUROR NESBITT: That's right.

THE COURT: I suppose you are anxious to serve so you can get that extra twenty-five dollars, too?

JUROR NESBITT: Taxes hit me pretty hard, so it doesn't matter one way or the other. It really doesn't. I have been on it from the beginning. I would like to stay, yes.

The interrogation was improper, particularly insofar as it implied, without foundation, that certain members of the jury failed to disqualify themselves because it was to their economic advantage to continue to serve as jurors. *Cf. Pfizer, Inc. v. Lord,* 456 F.2d 532, 544 (8th Cir.), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972).

discharging jurors in such a manner that the number of jurors remaining on the panel will fall below the mandatory number of twelve. (Defendants have previously represented that they will not stipulate to a continuation of the trial with a panel of jurors numbering less than twelve);

(2) In the absence of the stay herein applied for, the United States' right to an appellate review by a petition for a Writ of Mandamus will be irretrievably lost in that if the number of jurors is reduced to less than twelve and such jurors are finally discharged from duty in this case, the possibility of judicial review will be eliminated and it would be required to completely retry this extraordinarily complex and lengthy case, a result that would involve an enormous, unwarranted and wasteful duplication of judicial effort and the time of jurors and counsel and would impose upon the United States very great additional expense and burden;

(3) The United States has twice this date moved the District Court to stay any final discharge of any particular juror until such time as the United States has been afforded an opportunity to seek appellate review of this decision; these motions have been denied; and

(4) The granting of the stay herein applied for will not serve to prejudice defendants in any way. In connection with this motion, the United States represents that if this stay be granted, it will forthwith seek a Writ of Mandamus from this Court on the grounds that the District Court's action in discharging jurors constitutes a clear abuse of judicial discretion in that there existed no sound legal ground for such discharge and the Court's refusal to give the jurors instructions concerning their obligation to ignore publicity concerning this trial and the fact of settlement and for the further reason that the Court has conducted and presumably intends to continue to conduct the *voir dire* unfairly, improperly, and in such a fashion as to preclude the individual juror's ability to genuinely express their ability to continue to serve in a fair and impartial fashion. If this Court denies this petition for a Writ of Mandamus, the stay will be vacated, the jury discharged, and the defendants afforded a new trial as they now seek.

Following adjournment of the May 25th proceedings, the government advised the Clerk of this Court, by telephone, that the panel had been reduced to ten jurors and that the District Court had refused to stay the unconditional discharge of the nine jurors it excused.

On May 26th, we denied the petition as moot because the telephonic petition stated that it was necessary to have at least twelve jurors to continue the jury trial.

The government asserts that the matter is not moot. It points out that the local rules required a six-man jury in all civil cases at the time the jury was selected. It argues that since there are more than six jurors remaining, the case may still go forward.

The government also asserts that Judge Lord is determined to end his participation in this case and to do so in a way that precludes effective review by this Court. It suggests that he intends to either discharge at least five more jurors for prejudice and then grant a mistrial or grant a mistrial for one or more of the reasons stated below and immediately discharge the jury panel. It suggests that, in either event, he will then transfer the case out of Minnesota.

■ In view of this opinion, we are unwilling to accept the government's theory that Judge Lord will discharge additional individual jurors without good reason. We are equally unwilling to accept its theory that he will grant a mistrial without good reason and then discharge the jury panel to avoid review. Our unwillingness is strengthened by the fact that we cannot say, on the basis of the record before us, that Judge Lord will abuse his discretion if he granted a new trial on one or more of the grounds advanced by respondents,

namely: (1) cumulative errors in the admission or rejection of evidence; (2) error in permitting the consumer and competitor juries to be combined into a single jury; and (3) error in permitting the trial to proceed with less than twelve jurors. Contrariwise, we cannot say at this point on this record that Judge Lord would abuse his discretion by completing the present trial with a consolidated jury with less than twelve.

■ We must accept the government's contention that it would be a clear abuse of discretion on the part of Judge Lord to transfer this case out of Minnesota or to delay the final disposition of it.

This action had its origins in a 1958 Federal Trade Commission proceeding. It was commenced in 1969 and has been pending since that time. It was assigned to Judge Lord by the Judicial Panel on Multidistrict Litigation on December 7, 1970. The assignment was made with the consent and cooperation of the Chief Judges of the affected circuits. *In Re Antibiotic Drugs,* 320 F.Supp. 586 (1970).

Judge Lord transferred the case to Minnesota on May 14, 1971. Among the reasons he gave for transfer were:

■ The waiver by the plaintiffs of the original choice of forum.

■ The lack of showing that any important witnesses would be unavailable or even inconvenienced by the transfer.

\* \* \* \* \* \*

■ The fact that each of the defendants had already retained experienced counsel in Minnesota who had been active in the pretrial preparation of these cases.

■ The fact that the civil docket in Minnesota was the least burdened of any of the eleven districts where the actions had originally been filed.

■ [B]ecause of the complexity of these cases the interests of judicial efficiency made it highly desirable that the judge who conducted the pretrial proceedings continue as the trial judge[.]

■ [I]t would be impossible for him to remain in the Southern District of New York for the length of time that these trials were expected to take.

*Pfizer Inc. v. Lord,* 447 F.2d 122, 125 (2nd Cir. 1971).

The transfer to Minnesota was attacked in the United States Court of Appeals for the Second Circuit as an abuse of discretion. That Court rejected the attack. *See Pfizer Inc. v. Lord,* 447 F.2d 122 (2nd Cir. 1971).

The reasons given by Judge Lord for making the transfer retain their validity. In the ensuing years, the burden on the judges for the United States District Court for the District of Minnesota has significantly increased, but the burdens on the courts to which this case could be transferred have also grown significantly. If it were to be retransferred to the Southern District of New York, the most recent statistics of the Administrative Office indicate that it would not likely be reached for trial for at least twenty-five months. If it were retransferred to the District of Columbia, the same statistical source indicates that it would not likely be reached for trial for at least seventeen months. We cannot countenance delays of this magnitude in a case which was filed more than seven years ago.

There are other reasons why it would be a clear abuse of discretion to transfer this case out of Minnesota. (1) Many of the records and exhibits necessary for trial are now lodged in Minnesota. (2) Judge Lord accepted the responsibility of trying the case. In fulfillment of that responsibility, he expressed such strong disapproval of a tentative settlement of the case that settlement was abandoned.[7] Thereafter, the respondents asked this Court to disqualify Judge Lord for interfering in the settlement. We indicated that a District Judge lacks the power to approve or disapprove any proposed settlement, *Pfizer, Inc. v.*

---

7. *Pfizer, Inc. v. Lord,* 456 F.2d 532, 540–542 (8th Cir.), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972).

*Lord,* 456 F.2d 532, 542 (8th Cir.), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972), but declined to disqualify the judge, feeling that he could and would provide the parties an impartial forum in compliance with his judicial obligations. The situation is now reversed. The nongovernmental cases have been settled, but the government and the respondents have been unable to reach an agreement. One thing, however, remains constant and that is the need to have the case fairly and promptly tried and Judge Lord is clearly in the best position to take that action.

It is for Judge Lord to determine whether it is necessary to declare a mistrial. If he takes this action, it is his responsibility to commence a new trial immediately and to complete it as quickly as possible. If he decides that a mistrial is not required, it is his obligation to reconvene the jury and complete the trial in accordance with the same standard.[8]

In summary, we refuse to prohibit Judge Lord from discharging individual jurors on the jury panel. We do, however, specifically direct and order him not to transfer this matter to another jurisdiction and direct that the matter be disposed of promptly in accordance with the views set forth in this opinion.

The mandate of this Court shall issue forthwith.

Each party will bear its own costs.

---

8. We continue to believe that the public interest would be served if the parties reach a fair and just settlement. *See Pfizer, Inc. v. Lord,* 456 F.2d 532, 543 (8th Cir.), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972).