522 F.2d 612
 1975-2 Trade Cases 60,455
 PFIZER, INC., et al., Appellants,
v.
Honorable Miles W. LORD, United States District Judge, Respondent,
and
The Republic of Vietnam et al., Appellees.
PFIZER, INC., American Cyanamid Company, Bristol-Myers
Company, Squibb Corporation, Olin Corporation and
The Upjohn Company, Appellants,
v.
The REPUBLIC OF VIETNAM et al., Appellees.
PFIZER, INC., et al., Appellants,
v.
The Honorable Miles W. LORD, United States District Judge, Respondent,
and
The Government of India, Appellee.
 Nos. 74-1680, 74-1847 and 74-1870.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 31, 1975.
Decided Aug. 27, 1975.
 
 Samuel W. Murphy, Jr., Donovan, Leisure, Newton & Irvine, New York City, for appellants.
 Douglas V. Rigler, Foley, Lardner, Hollabaugh & Jacobs, Lawrence R. Velvel, Kirkwood, Kaplan, Russin & Vecchi, Harold C. Petrowitz, Becker, Channell, Becker & Feldman, and Samuel R. Simon, U. S. Dept. of Justice, Anti-Trust Div., Washington, D.C., for appellees.
 Thomas E. Kauper, Asst. Atty. Gen., Howard E. Shapiro and Samuel R. Simon, Attys., Dept. of Justice, Washington, D.C., filed for the United States, amicus curiae.
 Before GIBSON, Chief Judge, and LAY and ROSS, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 Several foreign governments[1] have filed antitrust suits alleging that the defendants,[2] six major pharmaceutical firms, conspired to fix prices on certain broad-spectrum antibiotics purchased by the plaintiff governments and their citizens.[3] The cases were consolidated in the District of Minnesota for pretrial proceedings and for trial with numerous other suits known collectively as the Antibiotic Antitrust Cases, and are now pending before Judge Miles Lord. The history and background of this litigation have been summarized in Pfizer, Inc. v. Lord, 456 F.2d 532 (8th Cir.), Cert. denied, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972).
 
 
 2
 The foreign governments assert in their complaints three theories of recovery, the last two of which would seem to be mutually exclusive since they involve the same claims. First, the governments ask treble damages based on their own purchases of defendants' antibiotics. Second, they sue under a Parens patriae claim as "official representative" of their individual and corporate citizens who purchased defendants' products. Third, they assert their right to serve as representatives of the class of all their citizens who have treble damage claims against defendants.
 
 
 3
 The defendants moved to dismiss the first claim on the ground that a foreign government is not a "person" entitled to bring a treble damage action under Section 4 of the Clayton Act. They asked dismissal of the second or official representative theory on the ground that absent formal assignment of these claims the governments could not sue on them outside the class action rules of Fed.R.Civ.P. 23. The district court denied both motions.
 
 
 4
 The defendants seek reversal of these interlocutory rulings:
 
 
 5
 (1) That foreign governments are "persons" entitled to sue for treble damages under § 4 of the Clayton Act; and
 
 
 6
 (2) That foreign governments may sue to collect the treble damage claims of their citizens, without complying with the requirements of Fed.R.Civ.P. 23 for class actions.
 
 
 7
 I. Mandamus.
 
 
 8
 The first issue, that is, whether the foreign governments are persons within the meaning of § 4 of the Clayton Act, is presented here by writ of mandamus, since the district court refused to certify the question for interlocutory appeal under 28 U.S.C. § 1292(b).[4] We do not reach the merits of this question since in our view mandamus does not lie to review this ruling of the district court.
 
 
 9
 The traditional use of the writ in aid of appellate jurisdiction has been to confine a lower court to a lawful exercise of its prescribed jurisdiction. Thus, "(t)he writ is appropriately issued . . . when there is a 'usurpation of judicial power' or a clear abuse of discretion." Schlagenhauf v. Holder, 379 U.S. 104, 110, 85 S.Ct. 234, 238, 13 L.Ed.2d 152 (1964); River Valley, Inc. v. Dubuque Cty., 507 F.2d 582, 585 (8th Cir. 1974). However, mandamus is not to be used when the most that can be claimed is that the district judge may have erred in ruling on a question clearly within his jurisdiction. Will v. United States, 389 U.S. 90, 104, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967).
 
 
 10
 The district court was presented with a difficult question of statutory interpretation, a question apparently of first impression. Even if its decision were erroneous (and we intimate no view on the merits), under the circumstances of this case it would not constitute a clear abuse of discretion.
 
 
 11
 Further, the mere fact that a court might err even on jurisdictional questions does not necessarily amount to a usurpation of power making mandamus appropriate.
 
 
 12
 (J)urisdiction need not run the gauntlet of reversible errors. The ruling on a question of law . . . was made in the course of the exercise of the court's jurisdiction to decide issues properly brought before it. . . . Its decision against petitioner, even if erroneous which we do not pass upon involved no abuse of judicial power.
 
 
 13
 River Valley, Inc. v. Dubuque Cty., supra, at 585, quoting from Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 382, 74 S.Ct. 145, 98 L.Ed. 106 (1953).
 
 
 14
 In Stein v. Collinson, 499 F.2d 91 (8th Cir. 1974), our court refused to reach the merits of a petition for writ of mandamus on a jurisdictional question arising out of a Chapter X reorganization proceeding. The court quoted the following from American Airlines v. Forman, 204 F.2d 230, 232 (3rd Cir. 1953):
 
 
 15
 It is true that this petition . . . challenges what can fairly be called a jurisdictional ruling. But that difference alone is not enough to make a peremptory writ appropriate. . . . The challenged assumption or denial of jurisdiction must be so plainly wrong as to indicate failure to comprehend or refusal to be guided by unambiguous provisions of a statute or settled common law doctrine. If a rational and substantial legal argument can be made in support of the questioned jurisdictional ruling, the case is not appropriate for mandamus . . . even though on normal appeal a reviewing court might find reversible error.
 
 
 16
 499 F.2d at 94.
 
 
 17
 Accordingly, the petition for a writ of mandamus must be denied.
 
 
 18
 II. Foreign Governments Suing As Parens Patriae on Behalf of Their Citizens in Antitrust Damage Suits.
 
 
 19
 The district court did certify for appeal under 28 U.S.C. § 1292(b) its order holding that the foreign governments may sue as Parens patriae on behalf of their individual and corporate citizens without notifying the citizens or fulfilling the other requirements of a Rule 23 class action, and may "apply the proceeds from the litigation to the benefit of their citizens as a whole." Misc. Order No. 74-37, Appendix at 18, 21. The district court recognized that several recent decisions had denied to states of the United States the right to bring similar Parens patriae actions on the grounds that the defendants might be subjected to duplicate liability, See e. g., Hawaii v. Standard Oil Co., 405 U.S. 251, 264, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); or, if the state suit barred the citizens' claims, that so to "take" their damage claims would be a deprivation of property without due process. See In re Multidistrict Vehicle Air Pollution Control Equip., 481 F.2d 122 (9th Cir.), Cert. denied sub nom., Morgan v. Automobile Mfg. Assn., 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); California v. Frito-Lay, Inc., 474 F.2d 774 (9th Cir.), Cert. denied, 412 U.S. 908, 93 S.Ct. 2291, 36 L.Ed.2d 974 (1973); Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp., 309 F.Supp. 1057 (E.D.Pa.1969), Aff'd., 438 F.2d 1187 (3rd Cir. 1970). Cf. In re Hotel Telephone Overcharges, 500 F.2d 86 (9th Cir. 1974); Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1012 (2nd Cir. 1973), Aff'd. on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2nd Cir. 1971).
 
 
 20
 The district court held these objections not applicable here because foreign governments and their resident nationals were concerned. The court found that defendants could not be threatened with duplicate liability because the governments' suit could be given Res judicata effect and, in any event, the practical difficulties facing foreign nationals would generally prevent them from filing their own suits. Due process objections to failure to notify the citizens of the litigation and to permit them to participate directly in it and its proceeds, even though it would bar their claims, were dismissed by the court on the ground that "the relationship between a foreign government and Its citizens is not restricted by the Constitution of the United States." Misc. Order No. 74-37, Appendix at 18, 21 (emphasis original).
 
 
 21
 We reverse, and hold that the plaintiff governments may not sue on behalf of their citizens' antitrust damage claims as Parens patriae. A Parens patriae action cannot be brought to collect the damage claim of one legally entitled to sue in his own right. The mere fact that the claimant or creditor is a foreign national does not afford him or his government access to judicial procedures barred to domestic creditors. Finally, we are unable to dismiss so easily as did the district court the due process implications of the procedure plaintiffs ask us to approve. In our view, plaintiffs may represent their citizens' damage claims only if they can do so within a Rule 23 class action.
 
 
 22
 Suits by a sovereign in the Parens patriae capacity have traditionally been limited to certain narrow areas.[5] Under English law, the king had the prerogative to act as a guardian of persons under such legal disabilities as infancy, incompetency and insanity. In addition, the king superintended charitable uses. In the United States, these Parens patriae prerogatives were expanded to include the right of a state to sue for the general welfare of its citizens at large, "to prevent or repair harm to its 'Quasi-sovereign' interests." See Hawaii v. Standard Oil Co., 405 U.S. 251, 257-258, 92 S.Ct. 885, 889, 31 L.Ed.2d 184 (1972).
 
 
 23
 Quasi-sovereign interests were defined by the Supreme Court as "interest(s) apart from (those) of particular individuals who may be affected," Georgia v. Pennsylvania R. Co., 324 U.S. 439, 451, 65 S.Ct. 716, 723, 89 L.Ed. 1051 (1945), and are different from the sovereign's proprietary interests. The latter relate to its direct contracts for purchase of goods and services. Generally these quasi-sovereign interests have been limited to harm to a state's physical environment and relief sought has been injunctive rather than damages. Thus in the area of public nuisance states have been recognized as proper parties to vindicate the quasi-sovereign claims in Parens patriae suits. See e. g., Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) (enjoining interference with flow of natural gas), Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907) (enjoining diversion of water from an interstate stream), Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901) (enjoining discharge of sewage into the Mississippi). This right was recognized in Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907), where quasi-sovereign interests were described by Mr. Justice Holmes as "independent of and behind the titles of its citizens, in all the earth and air within its domain."[6]
 
 
 24
 The Supreme Court did hold in Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) that Georgia might have the requisite separable interest to sue for damage to her general economy from an alleged railroad price-fixing conspiracy. In a more recent decision, however, the court indicated that such an interest of a state is not susceptible of measurement, that is, that injuries to the general economy are mainly just the sum of injuries to individual consumers and businesses, and hence, that the quasi-sovereign interest in the general economy could not support a Parens patriae suit for damages under the Clayton Act. Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).[7]
 
 
 25
 The interest relied on in the present case is much different, however, from those previously recognized in Parens patriae suits. The plaintiff governments assert no quasi-sovereign interest, their only interest is proprietary in nature. This would seem to give the governments standing to bring a class action on behalf of their citizens.[8] The governments assert, however, that a class action would not be financially feasible given the Supreme Court's decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). They ask that we expand the concept of Parens patriae to permit them to sue on behalf of persons legally entitled to sue on their own behalf, but as a practical matter generally unable to do so.
 
 
 26
 While there are no reported decisions on the right of a foreign government to prosecute such an action, in several recent instances domestic state governments have attempted to do so. So far none has been permitted to recover on that theory, and the Supreme Court has expressed a strong preference for class actions instead.
 
 
 27
 In Hawaii, the Supreme Court referred to the state's failure to appeal the dismissal of its class action count, and then said in Dicta:
 
 
 28
 We note in passing the State's claim that the costs and other burdens of protracted litigation render private citizens impotent to bring treble-damage actions, and thus that denying Hawaii the right to sue for injury to her quasi-sovereign interests will allow antitrust violations to go virtually unremedied. Private citizens are not as powerless, however, as the State suggests.Congress has given private citizens rights of action for injunctive relief and damages for antitrust violations without regard to the amount in controversy. 28 U.S.C. § 1337; 15 U.S.C. § 15. Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture. The District Court dismissed Hawaii's class action only because it was unwieldy; It did not hold that a State could never bring a class action on behalf of some or all of its consumer citizens. . . . The fact that a successful antitrust suit for damages recovers not only the costs of the litigation, but also attorney's fees, should provide no scarcity of members of the Bar to aid prospective plaintiffs in bringing these suits.
 
 
 29
 Parens patriae actions may, in theory, be related to class actions, but the latter are definitely preferable in the antitrust area. Rule 23 provides specific rules for delineating the appropriate plaintiff-class, establishes who is bound by the action, and effectively prevents duplicative recoveries.
 
 
 30
 405 U.S. at 265-66, 92 S.Ct. at 893 (emphasis added).
 
 
 31
 This strong preference for class actions over Parens patriae has been repeatedly expressed. In Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp., 309 F.Supp. 1057 (E.D.Pa.1969), Kansas and California sought to collect the treble damage claims of individual citizens via the Parens patriae and class action routes. Chief Judge John Lord held the Parens patriae claims to be "without legal foundation or policy support," Id. at 1063, and an attempt to circumvent the protective limitations of Rule 23.
 
 
 32
 Rather than provide a remedy to small-stake consumers allegedly denied by reasons of practicality the opportunity to bring actions available to other class action plaintiffs, allowance of the proposed claims would simply permit circumvention of the restrictions to which other class action plaintiffs are subject. The real advantages which would result from allowance of such claims would accrue to the benefit of plaintiff States. These plaintiffs would be permitted to bring class action suits without being subject to the limitations of ordinary Rule 23 class actions, and in addition would be afforded protection against an adverse decision in the determination of the proper plaintiff to represent various individual consumers in the class actions in the case of conflicting claims to representation. But the writers of the revised Rule 23 weighed the problems of manageability, fairness, and judicial economy in establishing the requirements therein, and the Court agrees with defendants that to allow a plaintiff State to recover damages for individual claimants in a substitute type of representative suit without the safeguards there provided would undermine the aims of that Rule.
 
 
 33
 Id.
 
 
 34
 See also California v. Frito-Lay, Inc., 474 F.2d 774 (9th Cir. 1973) (California sought treble damages for its citizens against various snack food companies); In re Motor Vehicle Air Pollution Control Equipment, 52 F.R.D. 398 (C.D.Cal.1970), Aff'd. 481 F.2d 122 (9th Cir. 1973); Land O'Lakes Creameries v. Louisiana St. Bd. of Health, 160 F.Supp. 387 (E.D.La.1958); Malina & Blechman, Parens Patriae Suits for Treble Damages Under the Antitrust Laws, 65 Nw.U.L.Rev. 193, 215-17 (1970).
 
 
 35
 We are not persuaded that these decisions are inapplicable merely because the plaintiffs are foreign governments suing on behalf of their nationals. Principles of comity, international law and existing United States treaties do not afford foreign sovereigns the right to press their citizens' claims in a manner barred to domestic states vis-a-vis their citizens. Reliance on authorities which sanction a sovereign's right to represent its citizens when their claim is against another sovereign who has not consented to suit in its own courts is misplaced. Foreign creditors are to be afforded legal access to our courts on the same basis as United States residents; practical difficulties notwithstanding, their status as foreigners does not entitle them to a more favorable remedy and procedures.[9] As the Supreme Court long ago observed in New Hampshire v. Louisiana,108 U.S. 76, 90, 2 S.Ct. 176, 183, 27 L.Ed. 656 (1883):
 
 
 36
 There is no principle of international law which makes it the duty of one nation to assume the collection of the claims of its citizens against another nation, if the citizens themselves have ample means of redress without the intervention of their government. Indeed, Sir Robert Phillimore says, in his Commentaries on International law, vol. II., 2d ed., page 12:
 
 
 37
 "As a general rule, the proposition of Martens seems to be correct, that the foreigner can only claim to be put on the same footing as the native creditor of the state."
 
 
 38
 Furthermore, in our view the district court may have erred in holding that the Due Process Clause of the Fifth Amendment would not entitle the foreign nationals whose claims are sought to be enforced to notice and an opportunity to participate in or exclude themselves from the litigation. The United States Constitution does not bind foreign governments in their relationship with their nationals, of course, but when rights of nonresident aliens to property within the United States are adjudicated in United States courts, nonresident aliens may well be entitled to due process protection.[10] See Guessefeldt v. McGrath, 342 U.S. 308, 318, 72 S.Ct. 338, 96 L.Ed. 342 (1952); United States v. Pink, 315 U.S. 203, 228, 62 S.Ct. 552, 86 L.Ed. 796 (1942); Russian Volunteer Fleet v. United States, 282 U.S. 481, 489-92, 51 S.Ct. 229, 75 L.Ed. 473 (1931); Sardino v. Federal Reserve Bank,361 F.2d 106, 111 (2nd Cir.) (Friendly, J.), Cert. denied 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).
 
 
 39
 We need not decide here, however, whether the Due Process Clause would of its own force prevent federal courts from permitting these antitrust claims to be compromised or collected in this instance without the consent of their owners. It is settled that when foreign governments invoke the benefits of United States courts to deal with tangible or intangible property located in this country, then their actions and decrees with respect to that property will be upheld only if consonant with the policy and law of the United States. United States v. Pink, 315 U.S. 203, 228-30, 62 S.Ct. 552, 86 L.Ed. 796 (1942); Republic of Iraq v. First National City Bank, 353 F.2d 47 (2nd Cir. 1965) (Friendly, J.), Cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966); Restatement (Second), Foreign Relations Law of the United States, § 43 (1965). The Supreme Court's emphasis in Hawaii on the preference for class actions and its delineation in Eisen of the exacting requirements of notice under Rule 23 lead us to find that it would be inconsistent with the policy and law of the United States to permit the plaintiff governments to sue as Parens patriae in this case. This is so even where, as in Eisen, the cost of a class action might be prohibitive and the claims are rendered practically unenforceable.
 
 
 40
 The remedy plaintiffs seek, if it can be made available at all, must come from Congress, who is best able to weigh its economic and political consequences and to consider alternative means of enforcing the antitrust laws of the United States. As Judge Medina observed in Eisen:
 
 
 41
 (S)tatements about "disgorging" sums of money for which a defendant may be liable, or the "prophylactic" effect of making the wrongdoer suffer the pains of retribution and generally about providing a remedy for the ills of mankind, do little to solve specific legal problems. The result of this approach is almost always confusion of thought and irrational, emotional and unsound decisions. In cases involving claims of money damages all litigation presumes a desire on the part of the judicial establishment to make the wrongdoer pay for the wrongs he has committed, but to do this by applying settled or clearly stated principles of law, rather than by some process of divination. Punishment of wrongdoers is provided by law for criminal acts in statutes making it a crime punishable by fine or imprisonment to violate the antitrust laws. In certain civil suits punitive damages may be awarded; and in private antitrust cases the possible recovery of triple the loss actually suffered by plaintiff is very properly praised as a supplementary deterrent. But none of these considerations justifies disregarding, nullifying or watering down any of the procedural safeguards established by the Constitution, or by congressional mandate, or by the Federal Rules of Civil Procedure, including amended Rule 23. It is a historical fact that procedural safeguards for the benefit of all litigants constitute some of the most important and salutary protections against oppressions, including oppressions by those whose intentions may be above reproach.
 
 
 42
 479 F.2d at 1013.
 
 
 43
 We note that the plaintiff governments did include a class action count in their complaints. Nothing in this opinion should be construed to prevent plaintiffs from representing their citizens within the confines of Rule 23 if the district court determines that the class should be certified under that rule.
 
 
 44
 The petition for writ of mandamus is denied. The order of the district court permitting the governments to proceed in their official representative or Parens patriae capacities is reversed. The cause is remanded to the district court with directions to dismiss that count of plaintiffs' complaints for failure to state a proper claim for relief.
 
 
 
 [1]
 The governments involved in this appeal are the Government of India, the Imperial Government of Iran, the Republic of the Philippines, and the Republic of Vietnam. Several other governments filed similar suits after entry of the orders from which these appeals were taken
 
 
 [2]
 The defendants are Pfizer, Incorporated, American Cyanamid Company, Bristol-Myers Company, Squibb Corporation, Olin Corporation and The Upjohn Company
 
 
 [3]
 After a new government gained power in South Vietnam, we requested briefs of the parties and the United States as amicus curiae on the effect of those events on the right of the government known as The Republic of Vietnam (RVN, the former government) to prosecute this action
 The Justice Department contacted the State Department to ascertain whether the United States currently recognized any government for the territory of South Vietnam. The State Department replied in the negative, stating that the United States no longer recognized the RVN and that it had not yet recognized the new De facto government either. The State Department indicated that it did not contemplate any change in this posture in the near future, and it recommended that RVN's suit be dismissed rather than suspended.
 The rule is that unrecognized governments may not maintain suits in state or federal courts. Guaranty Trust Co. v. United States, 304 U.S. 126, 136-41, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); Federal Republic of Germany v. Elicofon, 358 F.Supp. 747 (E.D.N.Y.1972), Aff'd. 478 F.2d 231 (2nd Cir. 1973), Cert. denied, 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974); Accord, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 408-12, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).
 Dismissal without prejudice of Vietnam's claim would seem to extinguish any possibility for the nation of Vietnam to collect the damages it claims, since the statute of limitations apparently ran in 1974. Presumably, then, even if a new government were soon recognized, a new action could not be timely filed.
 Another possibly proper course might be to suspend rather than dismiss the proceeding with regard to Vietnam for a reasonable time to see if a new government will be recognized, and if so, whether it would want to pursue this litigation. See, e. g., Bank of China v. Wells Fargo Bank & Union Trust Co., 190 F.2d 1010 (9th Cir. 1951); Republic of China v. Merchants Fire Assur. Corp., 30 F.2d 278 (9th Cir. 1929); Government of France v. Isbrandtsen-Moller Co., Inc. 48 F.Supp. 631 (S.D.N.Y.1943). Since we do not pass on the question of whether a foreign sovereign has standing as a "person" under § 4 of the Clayton Act, the district court will have to face the question of suspension or dismissal on remand. We need not decide whether Vietnam's Parens patriae claim brought on behalf of its nationals should be dismissed or suspended since as we shall discuss the Parens patriae claim fails to state grounds for relief.
 
 
 [4]
 The defendants also challenge the propriety of the district court's refusal to certify this question under § 1292(b). This court is without jurisdiction to review an exercise of the district court's discretion in refusing such certification. See United States v. 687.30 Acres of Land, 451 F.2d 667 (8th Cir. 1971), Cert. denied sub nom., Winnebago Tribe v. United States, 405 U.S. 1026, 92 S.Ct. 1291, 31 L.Ed.2d 486 (1972); Accord, Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1344 (2nd Cir. 1972) (Friendly, J.); Note, Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b), 88 Harv.L.Rev. 607, 616-617 (1975)
 
 
 [5]
 The use of Parens patriae suits by the state on behalf of its citizens is ably discussed in Malina & Blechman, Parens Patriae Suits for Treble Damages Under the Antitrust Laws, 65 Nw.U.L.Rev. 193 (1970); Comment, Wrongs Without Remedy: The Concept of Parens Patriae Suits for Treble Damages Under the Antitrust Laws, 43 S.Cal.L.Rev. 570 (1970); Comment, State Protection of Its Economy and Environment: Parens Patriae Suits for Damages, 6 Colum.J.L. & Soc.Prob. 411 (1970)
 
 
 [6]
 Early cases which rejected a state's right to file a Parens patriae claim were decided on the narrow ground that the Supreme Court lacked original jurisdiction under Article III, § 2 when the state was not asserting a separate interest from its citizens. Thus, in Oklahoma v. Atchison, Topeka & Santa Fe Ry. Co., 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911), Oklahoma sought to assert rights of shippers against a common carrier to restrain it from charging unreasonable rates within its jurisdiction. The Supreme Court denied the state the right to file an original suit in the Supreme Court since the suit did not involve any infringement of power of the State but rather special damage to its shippers. The Court observed:
 We are of the opinion that the words, in the Constitution, conferring original jurisdiction on this court, in a suit "in which a State shall be a party," are not to be interpreted as conferring such jurisdiction in every cause in which the State elects to make itself strictly a party plaintiff of record and seeks not to protect its own property, but only to vindicate the wrongs of some of its people or to enforce its own laws or public policy against wrongdoers, generally.
 Id. at 289, 31 S.Ct. at 437.
 See also Oklahoma v. Cook, 304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938).
 
 
 [7]
 In 1969 the State of Hawaii sought to recover treble damages for overcharges for petroleum products sold to the State itself (the first or "proprietary" count), for damages to the general economy (the second or Parens patriae count), and as the representative plaintiff for the class of all citizens with treble damage claims (the third or class action count). The district court dismissed the class action count and that was not appealed. The Supreme Court affirmed the Ninth Circuit's holding that the State could not recover for damages to the general economy under the Parens patriae count. 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), Aff'g. Hawaii v. Standard Oil Co., 431 F.2d 1282 (9th Cir. 1970). The Court held that the "business or property" limitation in the Clayton Act's treble damage provision meant that only damages to the State's commercial interests or enterprises were recoverable by the State; damage to the general economy was not compensable under the Act. 405 U.S. at 265, 92 S.Ct. 885. See also In re Multidistrict Vehicle Air Pollution, 481 F.2d 122, 126 (9th Cir. 1973)
 
 
 [8]
 For purposes of determining this question only, we will assume without deciding that the district court was correct in holding that foreign governments are "persons" entitled to bring treble damage actions under § 4 of the Clayton Act
 
 
 [9]
 The Treaty of Amity & Economic Relations between the United States and Iran, August 15, 1955, (1957) 8 U.S.T. 899, T.I.A.S. No. 3853, is not to the contrary. Article 3, paragraph 2, reads as follows in relevant part:
 Nationals and companies of either High Contracting Party shall have freedom of access to the courts of justice and administrative agencies within the territories of the other High Contracting Party, in all degrees of jurisdiction, both in defense and pursuit of their rights, to the end that prompt and impartial justice be done. Such access shall be allowed in any event, upon terms no less favorable than those applicable to nationals and companies of such other High Contracting Party or of any third country. . . .
 This merely guarantees access to United States courts on the same terms available to United States nationals, not more favorable terms or additional remedies.
 
 
 [10]
 In Sardino v. Federal Reserve Bank, 361 F.2d 106, 111 (2nd Cir. 1966), Judge Friendly wrote:
 The Government's second answer that "The Constitution of the United States confers no rights on non-resident aliens" is so patently erroneous in a case involving property in the United States that we are surprised it was made. Throughout our history the guarantees of the Constitution have been considered applicable to all actions of the Government within our borders and even to some without. Cf. Reid v. Covert, 354 U.S. 1, 5, 8, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). This country's present economic position is due in no small part to European investors who placed their funds at risk in its development, rightly believing they were protected by constitutional guarantees; today, for other reasons, we are still eager to attract foreign funds. In Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 491-492, 51 S.Ct. 229, 75 L.Ed. 473 (1931), the Court squarely held that an alien friend is entitled to the protection of the Fifth Amendment's prohibition of taking without just compensation even when his government was no longer recognized by this country. And the Court has declared unequivocally, with respect to non-resident aliens owning property within the United States, that they "as well as citizens are entitled to the protection of the Fifth Amendment."