# United States Court of Appeals
## For the First Circuit

No. 99-2170

ESTADOS UNIDOS MEXICANOS,

Plaintiff, Appellant,

LUIS RAMIREZ, ET AL.,

Plaintiffs,

v.

AUSTIN J. DECOSTER, D/B/A/ DECOSTER EGG FARM, D/B/A/ AUSTIN J.
DECOSTER CO.; QUALITY EGG OF NEW ENGLAND, LLC; MAINE AG, LLC,

Defendants, Appellees,

MAINE CONTRACT FARMING, LLC, ET AL.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

Karen Frink Wolf, with whom Harold J. Friedman, Sally A. Morris, and Friedman Babcock & Gaythwaite were on brief, for appellant Estados Unidos Mexicanos.

Rita H. Logan, with whom Timothy J. O'Brien, William C. Knowles, and Verrill & Dana LLP were on brief, for appellee Austin J. DeCoster, d/b/a/ DeCoster Egg Farm, d/b/a/ Austin J. DeCoster Co.

Timothy H. Somers, with whom Michael E. Cassidy and Hoff, Curtis, Pacht, Cassidy & Frame, P.C. were on brief, for appellees Quality Egg of New England, LLC and Maine Ag, LLC.

Herman Schwartz and Bruce Goldstein on brief for amicus curiae Farmworker Justice Fund, Inc.

Michael E. Malamut on brief for amicus curiae New England Legal Foundation.

-----------------

October 11, 2000

-----------------

**LYNCH, Circuit Judge**.  Claims of deplorable working and living conditions for migrant workers at DeCoster Egg Farms, a large Maine employer, were made in a civil rights action filed in May of 1998.  The thrust of the complaint was that workers of Mexican descent, be they American or Mexican citizens, were treated harshly because of their Mexican background, and that white, non-Mexican workers fared better.  The primary cause of action asserted violations of the workers' civil rights under 42 U.S.C. § 1981.  The complaint also asserted other claims, including claims of unsafe and unsanitary housing under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 et seq.  The complaint was filed by fourteen individuals, who proposed to represent a class of "all former and current migrant farm workers of Mexican race and descent" employed by Austin J. DeCoster and DeCoster Egg Farm.[1]

---

[1]     Austin J. DeCoster owned DeCoster Egg Farm individually until 1997.  Originally, the complaint named as defendants Mr. DeCoster and two successor companies, Quality Egg of New England, LLC, and Maine AG, LLC. Although plaintiffs later added other successor companies, those companies did not move to dismiss Mexico from the case and are not appellees in this appeal.

The other plaintiff was the Government of Mexico, the Estados Unidos Mexicanos, which said it was appearing in its parens patriae capacity to protect its citizens and its own quasi-sovereign interests. It is unusual for a foreign nation to claim standing under the parens patriae doctrine; more common is the appearance of other nations in suits to protect their own distinct interests or as amicus curiae in actions that may affect them. See, e.g., National Foreign Trade Council v. Natsios, 181 F.3d 38 (1st Cir. 1999), aff'd sub nom. Crosby v. National Foreign Trade Council, 120 S. Ct. 2288 (2000); United States v. Nippon Paper Indus. Co., 109 F.3d 1 (1st Cir. 1997), cert. denied, 522 U.S. 1044 (1998). Neither the Supreme Court nor this court has addressed the question of whether the parens patriae doctrine may be so employed by a foreign nation. The district court dismissed Mexico as a plaintiff for lack of standing. See Estados Unidos Mexicanos v. DeCoster, 59 F. Supp. 2d 120, 123-25 (D. Me. 1999). At Mexico's request, final judgment was entered as to this issue while the underlying action of the fourteen individual plaintiffs proceeded.[2] We

_____

[2] The district court has since denied class action certification and granted defendants' motion for summary

-4-

review the determination of lack of standing de novo, <u>see</u>, <u>e.g.</u>, <u>Serpa Corp.</u> v. <u>McWane, Inc.</u>, 199 F.3d 6, 9 (1st Cir. 1999), and affirm the dismissal of Mexico as a party to this action.


<u>The Doctrine of Parens Patriae</u>

"Parens patriae means literally 'parent of the country.'" <u>Alfred L. Snapp & Son, Inc.</u> v. <u>Puerto Rico</u>, 458 U.S. 592, 600 (1982). The doctrine has developed as to States of the United States. It creates an exception to normal rules of standing applied to private citizens in recognition of the special role that a State plays in pursuing its quasi-sovereign interests in "the well-being of its populace." <u>Id.</u> at 602; <u>see also</u> <u>Georgia</u> v. <u>Tennessee Copper Co.</u>, 206 U.S. 230, 237 (1907) (a State "has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain").[3] It is a judicially created exception that has been narrowly construed. The most complete explanation of the parens patriae doctrine in

---

judgment as to some of plaintiffs' claims. <u>See</u> <u>Ramirez</u> v. <u>DeCoster</u>, 194 F.R.D. 348 (D. Me. 2000).

[3] A State's quasi-sovereign interest is thus distinct from, for example, its sovereign interest in protecting and maintaining its boundaries and its proprietary interest in owning land or conducting a business venture. <u>See</u> <u>Snapp</u>, 458 U.S. at 601-02.

-5-

its modern incarnation,[4] as applied to the States of this country, appears in the Supreme Court's opinion in Snapp:

> In order to maintain [a parens patriae] action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development -- neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract -- certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being -- both physical and economic

---

[4] The parens patriae action has its roots in the common-law concept of the "royal prerogative," that is, the power of the king, as "father of the country," to act as the guardian for those under legal disabilities to act for themselves. See Hawaii v. Standard Oil Co., 405 U.S. 251, 257 (1972) (describing king's role as "'the general guardian of all infants, idiots, and lunatics'" (quoting 3 William Blackstone, Commentaries *47)); see also George B. Curtis, The Checkered Career of Parens Patriae: The State as Parent or Tyrant?, 25 DePaul L. Rev. 895, 898 (1976) ("[p]arens patriae was [originally] limited to a parental concern for dependent classes"). While American courts adopted this common-law concept, they did so -- consistent with the notion of legislative supremacy -- in the form of a legislative prerogative that was "to be exercised [by States] in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." Snapp, 458 U.S. at 600 (quoting Mormon Church v. United States, 136 U.S. 1, 57 (1890)). The Supreme Court expanded the doctrine by determining that an individual State could sue under parens patriae on behalf of all of its citizens. See Standard Oil Co., 405 U.S. at 257-58 (citing Louisiana v. Texas, 176 U.S. 1 (1900), as signaling the beginning of this trend).

> -- of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

458 U.S. at 607. Mexico stakes its claim in our case on this first type of quasi-sovereign interest, i.e., its interest in the general health and well-being of workers of Mexican descent employed by defendants. We do not reach the issue of whether there is a quasi-sovereign interest here, but simply assume that Mexico has interests apart from those of the individual plaintiffs and is more than a nominal party.

The question here presented is whether a foreign nation which asserts only quasi-sovereign interests and not its own proprietary or sovereign interests should be afforded standing as parens patriae. We consider this to be a question of prudential standing, and not an Article III question. See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982). Our answer is that parens patriae standing should not be recognized in a foreign nation unless there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government. See, e.g., Trafficante v. Metropolitan Life Ins. Co., 409 U.S.

205, 209 (1972) (finding statute clearly granted standing to private plaintiffs asserting housing discrimination claim).

Supreme Court Doctrine

The Supreme Court has never recognized parens patriae standing in a foreign nation where only quasi-sovereign interests are at stake. The justifications offered to support parens patriae standing in the individual States of the Union are not applicable here. Further, several doctrines of judicial restraint counsel against recognition of such standing.

Standing of foreign nations to bring suit in the federal courts has been recognized in cases in which the foreign nation has suffered a direct injury. "There is no question but that foreign States may sue private parties in the federal courts." Principality of Monaco v. Mississippi, 292 U.S. 313, 323 n.2 (1934). That standing has been conditioned on the requirement that the foreign nation satisfy the usual standing requirements imposed on individuals or domestic corporations. The Supreme Court "has long recognized the rule that a foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation

-8-

or individual might do."  Pfizer, Inc. v. Government of India, 434 U.S. 308, 318-19 (1978).  For example, foreign nations may bring treble damages antitrust claims under the Clayton Act to address their direct injuries.  Id. at 319.[5]

There is no argument made here that Mexico could meet normal standing requirements applied to individuals or domestic corporations.  Indeed, there is some danger that Mexico "advances abstract questions of wide public significance essentially amounting to generalized grievances more

---

[5]     The antitrust field has its own rules.  Even a State of the Union may not bring such actions in a parens patriae capacity claiming general injury to its economy because it has not, in that capacity, suffered an injury to its business or property within the meaning of § 4 of the Clayton Act, 15 U.S.C. § 15.  See Kansas v. Utilicorp United, Inc., 497 U.S. 199, 205-06 (1990) (State not a proper plaintiff as parens patriae for its citizens who paid inflated prices for natural gas when lawsuit already included as plaintiffs the public utilities that were the direct purchasers of the gas); Illinois Brick Co. v. Illinois, 431 U.S. 720, 726-29 (1977) (no injury to Illinois as indirect purchaser of of concrete blocks under § 4 of the Clayton Act).  Indeed, the Court has noted that even the creation of the new procedural device of parens patriae actions by States on behalf of their citizens to enforce existing rights of recovery under § 4 of the Clayton Act, see 15 U.S.C. § 15c(a)(1), "'creates no new substantive liability' . . . [but was] intended only as 'an alternative means . . . for the vindication of existing substantive claims,'" Illinois Brick, 431 U.S. at 733-34 n.14 (quoting H.R. Rep. No. 94-499 (1975), 1976 U.S.C.C.A.N. 2572, 2578).

appropriately addressed to the representative branches." <u>Benjamin</u> v. <u>Aroostock Med. Ctr., Inc.</u>, 57 F.3d 101, 104 (1st Cir. 1995).

Mexico's argument is based on the Supreme Court's recognition of standing in the States of the Union under the parens patriae doctrine. By analogy, Mexico says, it should be treated in like manner. Such an analogy is not implausible; indeed, in granting parens patriae standing to the States, the Supreme Court has analogized the States to foreign nations. <u>See</u> <u>Missouri</u> v. <u>Illinois</u>, 180 U.S. 208, 241 (1901). But the analogy is incomplete, and so the elegant symmetry of Mexico's argument fails.

The primary justification for recognizing parens patriae standing in the States, repeated throughout a century's Supreme Court caselaw, derives from important principles underlying our federal system. First, the States have surrendered certain aspects of their sovereignty to the federal government and, in return, are given recourse to solve their problems with other States. In <u>Missouri</u> v. <u>Illinois</u>, <u>supra</u>, the Court recognized parens patriae standing in the State of Missouri to sue the State of Illinois for sending sewage into the Mississippi River

that poisoned its drinking water, endangered the health of its residents, and impaired the commercial value of its towns and cities.  See Missouri, 180 U.S. at 241.  The Court noted:

> If Missouri were an independent and sovereign State all must admit that she could seek a remedy by negotiation, and, that failing, by force.  Diplomatic powers and the right to make war having been surrendered to the general government, it was to be expected that upon the latter would be devolved the duty of providing a remedy . . . .

Id. at 241; see generally Ann Woolhandler & Michael G. Collins, State Standing, 81 Va. L . Rev. 387, 446-47 (1995) (around the turn of twentieth century, the Court "began allowing states to vindicate in federal court their general interest in protecting their citizens" through interstate pollution actions to enjoin public nuisances).  Second, States require a sufficiently independent forum to resolve their disputes with one another.  Accordingly, under Article III of the Constitution, the Supreme Court has original and exclusive jurisdiction over actions between two or more States.  See 28 U.S.C. § 1251(a); see also Georgia v. Pennsylvania R.R. Co., 324 U.S. 439, 450 (1945) ("The original jurisdiction of this Court is one of the mighty instruments which the framers of the Constitution provided so that adequate machinery might be available for the peaceful

-11-

settlement of disputes between States and between a State and citizens of another State."); <u>see generally</u> Erwin Chemerinsky, <u>Federal Jurisdiction</u> § 10.3.1, at 580 (2d ed. 1994) ("Without a tribunal to resolve their differences, states might resort to armed conflicts with one another or other forms of coercive behavior.").[6]  Indeed, the Court's expansion of parens patriae doctrine beyond its traditional common law parameters took place in cases involving the Court's exercise of its original jurisdiction to decide controversies between States or between a State and a citizen of another State -- an area in which the Court acted as an arbiter between quasi-sovereign interests. <u>See</u> Curtis, <u>The Checkered Career of Parens Patriae</u>, 25 DePaul L.

---

[6]  Of course, for the Court to exercise original jurisdiction, such actions must meet the Article III standing requirements and be "susceptible of judicial solution." <u>Louisiana</u> v. <u>Texas</u>, 176 U.S. 1, 18 (1900) (accepting concept of parens patriae standing but finding elements of that standing not presented on the facts).  Additionally, the Court can exercise its discretion to refuse to hear disputes between States "with an eye to promoting the most effective functioning of this Court within the overall federal system." <u>See</u> <u>Texas</u> v. <u>New Mexico</u>, 462 U.S. 554, 570 (1983).

Rev. at 908. For obvious reasons, neither of these two federalism justifications applies here.[7]

Mexico stresses that it has sued private parties, not a State, as defendants, and turns for support to a subcategory of cases in which the Supreme Court has recognized parens patriae standing in States to sue private companies, not other States. That aspect of the doctrine originated in Tennessee Copper Co., supra. There Georgia was permitted to sue for injunctive relief against defendant copper companies that allegedly discharged noxious gasses over Georgia. Again, the Court rested its extension of the doctrine on federalism grounds:

> When the states by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining quasi-sovereign interests; and the alternative to force is a suit in this court.

---

[7] Furthermore, federalism concerns can also limit a State's parens patriae standing when the suit seeks to enforce its citizens' rights "in respect of their relations with the federal government," where it is the United States, and not the State, that represents them as parens patriae. Massachusetts v. Mellon, 262 U.S. 447, 485-86 (1923) (a State may not interpose itself to protect its citizens from the operation of allegedly unconstitutional federal statutes); see also Woolhandler & Collins, State Standing, 81 Va. L. Rev. at 491.

-13-

206 U.S. at 237.[8]   While Mexico is correct to concede that it would face additional problems if this suit had been brought against a State, this does not alter the fact that the federalism justifications for permitting States to bring suit parens patriae against private entities are simply absent here.

Nonetheless, Mexico says that under Snapp, a more recent case, its standing must be recognized.  Snapp involved Puerto Rico's participation in the Wagner-Peyser Act, 29 U.S.C. § 49 et seq., which had mandated the establishment of a nationwide employment system and encouraged the States to participate in that system if authorized by the Secretary of Labor.  See Snapp, 458 U.S. at 594-95.  Puerto Rico was included in the Act's definition of a State.  See id. at 594 n.1.  If unemployed persons capable of performing the labor sought could not be found in this country, then temporary foreign workers could be brought in.  See id. at 595.  Thus, the Act gave a preference to

---

[8]     Federalism concerns also underlay the subsequent extension of parens patriae standing to actions involving direct economic harm. See Pennsylvania R.R. Co., 324 U.S. at 450-51 (stating that actions of railroads in conspiring to fix freight rates in a manner that discriminates against Georgia shippers "relegates [Georgia] to an inferior economic position among her sister States . . . . These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected.").

United States workers (including citizens of Puerto Rico) for newly available jobs in this country and prevented such workers from being disadvantaged by foreign workers. See id. at 596. Puerto Rico certified more than a thousand of its workers to Virginia apple growers looking for temporary labor during the 1978 harvest season. When Virginia growers refused to hire Puerto Rican workers, including those who had already arrived in Virginia, Puerto Rico sued for declaratory and injunctive relief. See id. at 596-97.

The Court recognized parens patriae standing in Puerto Rico. Id. at 608. Although the Court recognized Puerto Rico's interest in avoiding discrimination against its citizens as a quasi-sovereign interest, it did so in the context of describing Puerto Rico's role in the federal system. See id. at 607-08 ("Distinct from but related to the general well-being of its residents, the State has an interest in securing observance of the terms under which it participates in the federal system.").[9]

---

[9]    Indeed, Puerto Rico had alleged, inter alia, that the discrimination by Virginia growers deprived it of "its right to effectively participate in the benefits of the Federal Employment Service System of which it is a part." Id. at 598 (internal quotation marks omitted).

-15-

The <u>Snapp</u> Court granted standing to Puerto Rico qua State under the Wagner-Peyser Act on two alternative grounds: 1) a State's interest in protecting citizens from discrimination, <u>id.</u> at 609; and 2) a State's interest in equal participation in a federal employment service scheme, <u>id.</u> at 609-10. Here, of course, Mexico relies only on the former ground. While <u>Snapp</u>'s discussion of federalism principles -- e.g., its discussion of a State's right to the observance of the terms of a compact by which it participates in the federal system, <u>id.</u> at 607-08 -- seems to refer distinctly to the second of the two grounds of standing, and thus the one not relied on here by Mexico, the two grounds dovetail in that residents were being excluded from participation in a federal program by virtue of discrimination.

We do not read <u>Snapp</u> as establishing parens patriae standing in a State in the absence of federalism concerns where the quasi-sovereign interest at stake is the prevention of discrimination against that State's citizens. Indeed, it remains questionable whether <u>Snapp</u> would permit a State to seek parens patriae standing on the basis Mexico asserts here because States are not assigned a special role in the enforcement of 42

-16-

U.S.C. § 1981, unlike the special role they are assigned under the Wagner-Peyser Act, 29 U.S.C. § 49 et seq., which was at issue in Snapp. But even if States could bring suits such as this one, Mexico's claim would still fail. By definition, a foreign nation has no cognizable interests in our system of federalism. And such interests are a critical element of parens patriae standing.

Nor is Mexico's position supported by adherence to any principle of customary international law. Such a principle would provide an arguable basis on which to grant standing. Mexico, however, has admitted that it knows of no such principle recognizing parens patriae standing in foreign nations and we likewise have found none.[10] Instead, Mexico points hopefully to the principle of comity. The principle is well recognized but beside the point. Comity permits foreign nations to sue in our courts if they meet the normal standing requirements imposed on individuals. See Banco Nacional de Cuba v. Sabbatino, 376 U.S.

---

[10] Parens patriae is not mentioned as an established principle of international law in either the Restatement (Third) of Foreign Relations Law of the United States (1987) or any major treatise in the field.

-17-

398, 408-09 (1964).  But parens patriae standing goes beyond normal standing requirements.

Moreover, the granting of parens patriae status to foreign nations would raise concerns beyond the lack of support for such status in precedent or prior reasoning.  One particularly compelling concern was thoughtfully articulated by the district court.  The conduct of the foreign affairs of this country is committed to the Executive and to the Congress.  This division of  power should give courts pause before entering this arena, absent guidance from those other two branches.  Care should be taken not to impinge on the Executive's treaty-making prerogatives or to assume that courts have the institutional competence to perform functions assigned elsewhere by the Constitution. See United States v. Kin-Hong, 110 F.3d 103, 110-11 (1st Cir.), stay denied, 520 U.S. 1206 (1997).  The Executive often requires, before extending rights to foreign nations, that there be agreements providing for reciprocal protection of American interests.  The ability of the other branches to secure such reciprocity could be undermined if the Judiciary did not adhere to the principal of non-interference. See United States v. Boots, 80 F.3d 580, 587-88 (1st Cir.) (reciting dangers of

-18-

this country's penal enforcement of other countries' customs and tax laws without reciprocal enforcement of American laws), <u>cert. denied</u>, 519 U.S. 905 (1996).

Mexico says that these concerns are alleviated by the act of state doctrine and the political question doctrine.  It is difficult to see what the act of state doctrine, which has traditionally precluded review by United States courts of official acts by foreign states, <u>see</u> <u>Oetjen</u> v. <u>Central Leather Co.</u>, 246 U.S. 297, 303-04 (1918), has to do with the situation here.[11]  And while there is some parallel to the political question doctrine, it works against Mexico.  Again, the very question of whether a foreign nation should be given rights to sue beyond those rights enjoyed by United States citizens raises concerns about the allocation of responsibility among our three branches of government.

---

[11]     The Court's more recent justification for the doctrine as an expression of the domestic separation of powers further undermines Mexico's argument here.  <u>See</u> <u>W.S. Kirkpatrick & Co., Inc.</u> v. <u>Environmental Tectonics Corp., Intl.</u>, 493 U.S. 400, 404 (1990) (act of state doctrine reflects "'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs" (quoting <u>Sabbatino</u>, 376 U.S. at 423)).

In addition, other reasons for caution stem from the rules and procedures within the federal judiciary. As the Eighth Circuit noted in denying parens patriae status to foreign governments in a Sherman Act case, class actions are often the preferable vehicle to pursue claims on behalf of a country's citizens. See Pfizer, Inc. v. Lord, 522 F.2d 612, 617-18 (8th Cir. 1975) ("th[e] strong preference for class actions over Parens patriae has been repeatedly expressed"), cert. denied, 424 U.S. 950 (1976). Furthermore, the potential exists for conflicts between the individual litigants and the parens patriae nation plaintiff over issues of settlement, appropriate relief, and the like. See Lisa Moscati Hawkes, Note, Parens Patriae and the Union Carbide Case: The Disaster at Bhopal Continues, 21 Cornell Int'l L.J. 181, 181-83 (1988) (discussing case brought by government of India under the parens patriae doctrine in which India blocked settlement offer that individual plaintiffs had wanted to accept). But see Comment, Parens Patriae Representation in Transnational Crises: The Bhopal Tragedy, 17 Cal. W. Int'l L.J. 175, 184 (1987) (suggesting that unusual circumstances surrounding Bhopal case made it ideal for application of parens patriae doctrine). Indeed, relief

obtained by the parens patriae plaintiff may bar private litigants from later bringing suit. See City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 334 (1958). Commentators have also suggested that, even as to individual States, parens patriae standing should be limited because "expansive state standing has a serious potential to undermine rather than complement individual standing in constitutional cases." Woolhandler & Collins, State Standing, 81 Va. L . Rev. at 396.

Mexico says that there is no potential for conflict because it seeks only declaratory and injunctive relief whereas the individual plaintiffs seek primarily monetary compensation. In fact, the individual plaintiffs also sought injunctive relief, particularly on behalf of the putative class. See Ramirez, 194 F.R.D. at 352 (plaintiffs' seek to enjoin DeCoster "from maintaining a policy of discrimination against Mexicans regarding the terms and conditions of their employment").[12]

---

[12]    While there is the problem of overlap and potential conflict whenever parens patriae standing is allowed, cf. Pfizer, 522 F.2d at 618 (explaining why parens patriae actions lack the various safeguards contained in the class action rules), we do not suggest, however, that the mere presence of potential conflict might alone prove a sufficient basis on which to deny such standing.

To summarize, we have looked to Supreme Court precedent and doctrine to see whether there is warrant to extend parens patriae standing to a foreign nation in this action. There is no direct precedent allowing for such status and the federalism concerns that animate recognition of parens patriae status in the States are simply absent. Moreover, there are reasons for the courts not to recognize such standing, reasons stemming from the assignment of the foreign relations powers to the other branches. There are other reasons having to do with prudential considerations within the courts themselves, concerns about avoiding conflict with the class action rules and about undermining the role of the individual plaintiffs. All of these reasons may be overcome should the Supreme Court or other two branches decide these policy concerns differently. But the Supreme Court has not yet done so, and we thus turn to the other two branches.

The Coordinate Branches

What is left is the question of whether the Executive or the Congress has given any guidance on the issue before us.

-22-

No party contends that Congress took a position on the topic in the definition of the word "persons" within the meaning of the Civil Rights Act, 42 U.S.C. § 1981. Nor does Mexico point to a treaty or executive agreement affording it special, parens patriae standing. Further, Mexico points to no statute recognizing such standing. By contrast, Congress has expressly authorized the United States, by its Attorney General, to enforce federal statutes and some Fourteenth Amendment rights. See, e.g., Civil Rights Act of 1964, 42 U.S.C. § 2000a-5 (1994) (authorizing suits for injunctive relief to enforce an individual's right to equal enjoyment of public accommodations); id. § 2000e-5 (authorizing suits for injunctive relief from discriminatory employment practices); cf. Larry W. Yackle, A Worthy Champion for Fourteenth Amendment Rights: The United States in Parens Patriae, 92 Nw. U. L. Rev. 111, 114 (1997) (advocating parens patriae suits by the United States to enforce the Fourteenth Amendment).

To the contrary, the defendants say, Congress and the President have indicated that disputes such as these are not to be heard by the courts but are instead to be governed by the North American Free Trade Agreement ("NAFTA") and, more

-23-

specifically, by the so-called labor "side agreement." See

North American Agreement on Labor Cooperation, Sept. 8, 9, 12,

and 14, 1993, 32 I.L.M. 1499 (1993) ("NAALC"). Since NAFTA and

NAALC govern this conflict, defendants say that these agreements

provide Mexico's exclusive remedy and preclude resort to the

federal courts. The NAALC establishes four levels for settling

labor law disputes, including top-level consultation between

national labor law ministers of the respective member States.

See id. art. 22, 32 I.L.M. at 1508.[13] Such consultation extends

to any labor law matter within the scope of the Agreement, see

id., including the elimination of employment discrimination, see

---

[13] Following ministerial consultations, a single Party may initiate the establishment of an Evaluation Committee of Experts, which in turn performs an independent, non-adversarial analysis and then provides recommendations covering all three Parties' labor law enforcement in the particular area in issue. See id. arts. 23-26, 32 I.L.M. at 1508-09.

In addition to providing for these ministerial consultations, the NAALC also allows private parties to file submissions for review by a National Administrative Office (NAO) established within the respective federal department of labor of each member State. See id. arts. 15-16, 21, 32 I.L.M. at 1507-08. The NAO investigates the submission (which investigation, in the United States, includes holding a public hearing) and issues a report. See generally Clyde Summers, NAFTA's Labor Side Agreement and International Labor Standards, 3 J. Small & Emerging Bus. L. 173 (1999).

id. Annex 1, ¶ 7, 32 I.L.M. at 1515-16.[14]   If the parties are unable to resolve the matter by cooperation, NAALC provides for dispute resolution through binding arbitration.  Id. arts. 27-41, 32 I.L.M. at 1509-13.  Mexico rejoins that while NAFTA covers disputes between governments, such as a claim by Mexico that the United States is not enforcing its own labor laws, this action involves discrimination claims against a private party. While Mexico's argument is not without force, resolution of this precise issue is not necessary.  The important point is that there is no suggestion in NAFTA or NAALC that the other two branches of the United States government intended to grant Mexico special standing as parens patriae to pursue these claims.[15]

_____

[14]   Similarly, the scope of NAALC review extends to another Party's "labor law, its administration, or labor market conditions in its territory."  Id. art. 21, 32 I.L.M. at 1507.

[15]   To the extent that Mexico believes that the United States has failed to enforce its labor laws against defendants, it appears that Mexico may use the mechanisms set forth in the NAALC.  Although NAALC's arbitration mechanism would not seem to encompass the instant allegations of racial discrimination against defendants, see id. art. 29, 32 I.L.M. at 1509-10 (limiting the scope of arbitration to "the alleged persistent pattern of failure by the Party complained against to effectively enforce its occupational safety and health, child labor or minimum wage technical labor standards"), Mexico could still pursue these claims through the process of ministerial

Finally, the district court commendably invited comment from the U.S. Department of State. The State Department, however, declined to comment, and thus, again, there is no indication of support by the Executive Branch for Mexico's position.

Mexico's final arguments, which are based in policy, are not insignificant. More than one thousand workers of Mexican descent worked at DeCoster between 1992 and 1996. Many of these transitory workers are poor, are isolated both geographically and culturally, are economically dependent on their employer, and are in a poor position to obtain legal services or to work with counsel. Amicus Farmworker Justice Fund, Inc. also points to decreased efforts by federal agencies charged with enforcing wage and hour laws in agriculture.[16] Mexico, however, is not left powerless to address these concerns. As the district court suggested, Mexico could financially support the plaintiffs in their efforts or seek to participate as amicus. Moreover, the alleged violations may be entirely appropriate for Mexico to raise with the United States though diplomatic channels. But

consultation described above.

[16] We acknowledge with appreciation the amicus briefs submitted by both the Farmworker Justice Fund, Inc. and the New England Legal Foundation.

the courts, absent the type of clear direction discussed earlier, are not the appropriate forum for the litigation of Mexico's quasi-sovereign interests.

The judgment of dismissal as to Mexico as a party plaintiff is affirmed.  No costs to either party.